In re estate of JOHN BOTTOMLEY, deceased.

[Decided November 8th, 1920.]

1. In appraising (pursuant to the Transfer Inheritance Tax act) the value of shares of stock owned by decedent in a close corporation, it is not error for the comptroller to consider among the assets of the corporation an item of good-will carried on the books of the corporation and sworn to by the treasurer of the corporation—there being no evidence that such item was not in fact an asset of the company.

2. Where a transfer of stock in a corporation is made by decedent in his lifetime under circumstances clearly indicating it to be in lieu of a testamentary disposition, it is a transfer made in contemplation of death within the meaning of the provisions of the Transfer Inheritance Tax act, and hence taxable.

3. Decedent, about one year before his death, aged seventy-one, although in no expectation of early decease, contemporaneously with the making of his will, assigned and delivered to his son shares of stock constituting about three-fourths of his entire estate—the son agreeing in return to pay to decedent a life annuity equal in amount to the annual dividend on the stock.—*Held*, that such transfer was made "in contemplation of death," and properly taxed.

On appeal from transfer inheritance tax assessment.

*Messrs. Harris & Harris,* for the appellants.

*Mr. Thomas H. McCran,* attorney-general, and *Mr. Francis H. McGee,* assistant attorney-general, for the state.

BUCHANAN, VICE-ORDINARY.

The tax as levied by the comptroller, under *Comp. Stat. p. 5301,* as amended by *P. L. 1914 p. 267,* against the estate of John Bottomley, deceased, was $9,333.69. The present appeal therefrom is by the executor, John A. Bottomley, and presents two questions.

Dealing with these questions in the inverse order of their specification in the petition of appeal, it is claimed that the proceedings by the comptroller were erroneous, in that a portion of the property admittedly taxable, to wit, five hundred and seventy

shares of stock of Highland Shaker Sweater Company was erroneously and excessively appraised at $105 per share. In this behalf it was sought to prove before this court that the true value of the stock in question was less than the value placed upon it by the comptroller, by evidence as to a certain sale of some of this stock—evidence which had not been submitted to the comptroller, and is therefore inadmissible on this appeal. *In re Pierce, 89 N. J. Eq. 171.* Furthermore, the circumstances of the sale were such as to deprive the price brought thereat of any weight as evidence of value, particularly in an attempt to override the judgment of the comptroller.

The appraisal is further attacked upon the ground that the comptroller in arriving at the value of the stock by computation of the assets and liabilities of the corporation (admittedly a close corporation) included among the assets of the corporation an item of "good-will—$26,965.19." Appellants' contention is that good-will is not an asset of a corporation, at least for the purpose of arriving at the value of the stock of the corporation for transfer tax purposes, and that the comptroller should not have considered it in his computation of the net assets of the company. Surely, little more than the statement of this contention is necessary to demonstrate its unsoundness. Not every corporation, of course, necessarily has good-will amongst its assets. That the corporation did have such an asset is not denied. The present appellant in the proofs submitted by him under oath to the comptroller listed it as an asset of the corporation and fixed its value as $36,348.76. The comptroller in his computation estimated its value at only $26,965.19. The question here presented is not whether good-will is taxable property under the statute as an asset of decedent's estate (such as might arise in the case of a testamentary gift of a business carried on by decedent as an individual in his lifetime), but whether good-will if it in fact exists as an asset of a corporation, is to be considered in arriving at an estimate of the net value of the corporate property.

Moreover, it must not be lost sight of that the error alleged is that the value of $105 per share at which the stock was appraised by the comptroller, "is in excess of the actual or true value of

said stock." It is, therefore, with the *result* of the comptroller's computations that we are now concerned, and not a mere step in the method of reaching that result. Unless the result be wrong—that is, the comptroller's valuation be in excess of the true value—any defect, or any number of defects in the steps taken to reach the result, are utterly immaterial. A mistake in one direction may be more than counterbalanced by another mistake in the other direction. The burden of proof is on the appellant and it is for him to show that the true value is less than $105 per share.

In so far as this appraisal is concerned, the tax proceedings must be affirmed.

The other issue raised is as to whether or not the comptroller erred in including as taxable, amongst the property passing to the executor as an individual, five hundred and twenty shares of preferred stock and three hundred and seventy-eight shares of common stock of Highland Worsted Mills. This stock, of the total aggregate value of $343,999.16, was by the comptroller determined to be a "gift, taking effect at death."

The stock in question was owned by decedent (the owner of the majority of the stock of the company) until January, 1918, at which time he assigned it to his son, the present appellant— the assignment being physically completed by transfer on the books of the company and the issuance of new certificates to the son. The only testimony as to the circumstances of the transfer is that of the son. He says that the father had taken little, if any, active part in the management of the company since his stroke of apoplexy in 1904. The son had entered the company's employ in 1908 to learn the business. In 1909 he was made assistant manager—one Henry being the manager. In 1913 he was made manager in place of Henry, as the result of his representations to his father, and so continued till the father's death. His salary as manager was $3,000 a year at first—for the last two or three years it was $12,000, which was a normal salary for the office.

In 1913, when the son became manager, the concern was, he says, insolvent—with a floating indebtedness of $300,000 and a credit at bank of only about $15,000. He succeeded in a finan-

cial reorganization, and establishing bank credit limited only by the bank's capital. The company's operation for each of the years 1910–1915, inclusive, showed large net losses; for the years 1916–1918 large net profits. He says that war conditions were little, if any, factors in these profits.

Some years prior to 1918 the father had made a gift of $25,-000 of the common stock of the company to Mr. Henry. The son, toward the end of 1917, suggested to the father that some such similar recognition ought to be given him, in view of his low salary at the start and what he had done for the company since, and received the reply that he would think it over. In January, 1918, the father agreed to transfer, and did transfer, the stock as above mentioned, on the son's oral promise to pay him for the rest of his life an annual sum equivalent to the six per cent. dividend on the preferred stock, which would be $15,-600. The father had received dividend of $15,600 January 1st, 1918, and the son forthwith commenced and continued to pay him monthly $1,300, receiving, January 1st, 1919, dividend of $15,600.

The son needed his salary for the living expenses of himself and family and had no other securities from which income could be used to pay the $15,600 annuity. The father needed the $15,-600 annuity, for his annual income aside from that was only some $6,000 or $7,000. This gift to the son comprised some seventy or seventy-five per cent. of the father's property, and comprised seven-eighths of the father's total provision for the son (that is, the son received by the will about one-seventh of the value of the stock comprised in the transfer of January, 1918).

At the same time as this gift to the son, January 6th, 1918, the decedent made a transfer of sixty shares of the preferred stock to his wife. The two gifts left him with only twenty shares of preferred stock and six shares of common. Also, at the same time, he had his will prepared (executed on January 8th, 1918), wherein he referred to the gift of sixty shares as ample provision already made for her, and bequeathed her the remaining twenty shares of preferred stock.

He had had the stroke of apoplexy fourteen years previously, and since then had spent most of his time in travel. The son's affidavit is that his father's health was "good" up until the time of his death; and that both physically and mentally he "compared favorably with men of his age." Dr. Jarrett, the family physician until 1914, says that in 1914 decedent had "recovered to a great measure from the stroke of apoplexy," and was "allowing for the said stroke of apoplexy, in good physical and mental health, and there was no reason to believe that he did not have a considerable number of years to live." Dr. Pechim attended decedent, 1914 to 1918, for minor ailments, and says that he was in good physical and mental health, "taking into consideration the fact that he had had a stroke of apoplexy a number of years before," and that in his estimation decedent, in 1918, "had a considerable number of years to live."

Decedent died April 25th, 1919, aged seventy-two.

The comptroller taxed the stock in question as being a gift to take effect at death. If it was that, or if it was a gift in contemplation of death, the tax must be affirmed. The son says it was neither; that it was not really a gift without consideration at all; that as to part, it was in consideration for his prior services to the company, and as to part was in consideration for his promise to pay the annuity equal to the dividend.

The appellant contends that there was, in any event, a complete transfer, by which the son then presently became the absolute owner of the stock; that the son did not hold the stock in trust to pay the income therefrom to the father for life, but the father was a mere creditor of the son to the extent of $15,600 per year; and that the case, therefore, is entirely different from the situation in such cases as *In re Brandreth, 169 N. Y. 437*, or *In re Cornell, 170 N. Y. 423*. Technically, this is doubtless true, but I confess I have grave doubts as to the correctness of any adjudication which should hold that the subject-matter of the gift, under such circumstances, was not taxable. It is clear, of course, that decedent must actually have had in mind the transfer inheritance tax statute, and did what he did in order to avoid the payment of tax thereunder. Admittedly, he would have made no such gift without getting back the income, or the

equivalent, for the rest of his life. The natural way to accomplish that result would be to make a gift of the stock, with a provision that he should receive the income during his life. No reason can be imagined for a provision that he should receive an annual sum "equivalent to the income," except the knowledge of the statute and adjudications on the part of himself or his legal adviser, and the desire to avoid the payment of the tax. Undoubtedly, he had legal advice between the time of the son's request, in November, 1917, and the transfer in January, 1918, on this point as well as in regard to his will. Of course, the taxing measure is to be strictly construed, and there is nothing wrong in a desire or an attempt to do a thing in a way which the statute does not make taxable, rather than in a way which is taxable. But the question remains, Has he done it in a way which is not taxable? The statute makes taxable a gift "intended to take effect in possession *or enjoyment*" at or after the death of donor. It is difficult to see how there could be much *enjoyment* by the donee of this gift, while he continued to pay out as much as he received therefrom.

However, it is unnecessary to decide this question, in view of the conclusion which I reach on the other contention. The statute imposes the tax in the case of "transfer * * * by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor."

A man in good health and only twenty-five years of age who makes his will, then and there "contemplates" his death, in one sense. Probably, it would not be contended that a contemporaneous gift would fall within the meaning of the statute. On the other hand, a man who knows he is about to die "contemplates" his death in a very much stronger sense. A gift made by him under such circumstances falls within a class well known to the law, termed gifts *causa mortis*. I think it is quite clear, from the language used by the legislature, that the intent of the statute is not restricted to this class. Considering not only the language, but the nature and design of the entire statute, and the history of the legislation upon this subject. I am convinced that a transfer made in lieu of making a testamentary disposition comes within the expressed intent of this legislative provision.

The design of this so-called inheritance tax legislation was not to interfere with a man's own enjoyment of the property he acquired, during the time he could, and did, desire to own and enjoy it himself—*prima facie,* his lifetime—but to take a toll out of such property *after* the owner had finished with it, on its way to those to whom, under and by virtue of the laws and the governmental machinery of the state, it should then pass. The natural and logical time for the fastening of such a tax was therefore at the death of the owner—and the statutes at first taxed the property passing by will or intestate succession. Gifts made to take effect at the death of the grantor or donor were, in effect, only another form of testamentary disposition, and they were also taxed. Then there arose those gifts or transfers made and taking effect in the donor's lifetime, but in fact being dispositions made by him because he had finished, either wholly or partially, with his desire for enjoyment of the subject-matter and desired to make a transfer in his lifetime which would take the place of a transfer by will and would not be subject to the tax—hence, the addition to the statute of the provision as to gifts in contemplation of death.

That the transfer now under consideration is of that character there cannot be the slightest doubt. It includes the great majority of the decedent's property; was made when he had passed the scriptural mark of three score years and ten, and, therefore, when his "contemplation" of death was that of an event not on the horizon of life but in its foreground, and, perhaps, very near; he had had the prior apoplectic stroke which, despite his recovery, had left its effects. It was made contemporaneously with a gift to his wife, which he, in effect, characterizes in his will as a gift in lieu of testamentary disposition. Finally, he makes the gift only upon the son's promise to pay to him for the rest of his life the same amount of money that he would have derived from the subject-matter of the gift. By so doing he had, as a practical matter, provided that the making of the transfer should have no effect upon his own income or mode of living until his death.

If such transfer is not one made in contemplation of death, and in the place and stead of a testamentary disposition, then

I can conceive of nothing which would come within that category.

The son claims that it was not a gift but a transfer for consideration. In so far as concerns the then presently moving consideration—the technical consideration of the son's promise to pay the life annuity to his father—I cannot see that this makes any difference. The statute specifically applies to transfers by *"bargain"* and *"sale,"* as well as by gift, when made in contemplation of the death of the *"vendor"* or donor. Whether, if the son had paid a larger consideration than he did, it would make any difference in the taxability of the transfer, or the amount of the tax to be levied, it is not necessary now to decide. In the present case the consideration actually paid by him was the promise (duly kept and performed) to pay a life annuity equal to the annual income from the stock transferred to him. The stock was appraised as of the date of testator's death, and the tax imposed upon that valuation. The practical result, therefore, is precisely as if the transfer had been by testamentary bequest.

Neither am I able to perceive that the "consideration" of the son's prior services alters the case. There was no legal obligation resting on the father. The son performed services for the corporation and had received therefor the full salary in return for which he had contracted to perform those services. Those services incidentally benefited the father—and one may feel that the son well merited some recognition thereof from the father. (On the other hand, the son was at the same time benefiting himself, for it was naturally to be expected that he would eventually succeed to the ownership of the company, as he did.) There is, however, nothing to *prove* that the father would have made a gift to his son, in recognition of the services, if he had not made the transfer which he actually put through.

Furthermore, it may be conceded that if the father had not made the arrangement and transfer which he did, he would have made a gift to the son in recognition of the services mentioned; and it may also be conceded, for the sake of argument, at least, that if he had made such a gift it would not be taxable—still there is no possible way of determining what the amount of that

gift would have been.   I do not see how a tax can be computed upon theories—upon probabilities or possibilities of what *might* have been done;  the comptroller must deal with the actuality— with what *was* done.

I conclude, therefore, that the tax appealed from must be affirmed.