In the matter of the inheritance taxes on the estate of
FRANCIS A. HALL, deceased.

[Decided January 5th, 1923.]

1. Under the Transfer Inheritance Tax act a transfer, if made in contemplation of death, is taxable, notwithstanding it be by way of bargain or sale, with consideration passing to the transferor.

2. In such case the transaction is to be examined, and if it appears that a substantial diminution of the transferor's assets resulted therefrom, the tax imposed by the statute applies thereto.

3. On appeal from the comptroller's appraisement and assessment his findings of fact will be set aside only if the evidence be insufficient to sustain them or for other legal error.

4. Evidence examined—*Held*, sufficient to support finding that bargain or sale was made in contemplation of death and was in substance a taxable transfer.

5. Decedent, shortly before his death, being a partner in a firm whose articles of agreement gave him the right at any time to take over the business and assets of the firm by paying the other partners the value of their shares, exclusive of good-will, executed a dissolution agreement whereby the other partners took over the business and assets, including the good-will, and decedent became a creditor of the new firm to the amount of his capital investment, exclusive of good-will.—*Held*, that the transaction, in substance, amounted to a gift to the other partners (his sons) of his right to acquire, without payment therefor, the good-will of the business; and that the value of that right was substantially equal to the value of the good-will of the business.

6. Comptroller's computation of the value of good-will examined as to method and evidence, and *held* not erroneous.

7. Assessment will not be set aside for mere technical misnomer of property the transfer whereof was assessed.

On appeal from transfer inheritance tax assessment.

*Messrs. McCarter & English* and *Mr. Otto Wierum* (of the New York bar), for the appellants.

*Mr. Thomas F. McCran,* attorney-general, and *Mr. Francis H. McGee,* assistant attorney-general, for the state.

BUCHANAN, VICE-ORDINARY.

The executors of the estate of Francis A. Hall, deceased, have appealed from the tax of $4,567.74 levied by the comptroller of the State of New Jersey against the estate of the said decedent under the provisions of the so-called Transfer Inheritance Tax act. *Comp. Stat. p. 5301.*

It appears that the comptroller, in his computation of the taxable assets of the estate, included therein an item of good-will or interest in the partnership business of Frank A. Hall & Sons, upon the ground that a transfer thereof had been made by decedent in his lifetime, in contemplation of death or to take effect at death, and assessed the value thereof at $135,860.76.

The appellants contend (*a*) that no transfer of good-will was in fact made; (*b*) that if any such transfer was made it was not done in contemplation of death nor to take effect at death, and hence does not come within the statute, and (*c*) that even if made, and subject to taxation, the comptroller's valuation was excessive and the tax based thereon therefore erroneous.

(Appeal was taken also in regard to another portion of the tax proceedings, but was not argued, it being stated to the court that a compromise thereasto has been agreed upon.)

Decedent was a manufacturer of beds and bedding, carrying on business at some four establishments in New York and one in Philadelphia. In 1910 he took two of his sons into partnership with him; in 1918 this was dissolved and a new partnership entered into which included these three and also decedent's third son; on May 23d, 1919, this second partnership was dissolved, decedent retiring from the business and the sons forming a new partnership to take it over and carry it on. On each of these three occasions the interests, rights and liabilities of the several parties involved were specifically provided for in carefully-drawn contracts. On June 14th, 1919, he executed his last will and testament; and on July 18th, 1919, he died, aged seventy-four, his death being the result of heart trouble, from which he had suffered for some four years.

In dealing with the first issue—as to whether or not a transfer of good-will was in fact made on May 23d, 1919—it is necessary to examine the provisions of the prior partnership agreements and the legal effects thereof.

By the 1910 agreement the copartnership thereby formed specifically "takes over as of this date the business heretofore conducted by the said Francis A. Hall under the name of Frank A. Hall," and is to conduct that business under the name of Frank A. Hall & Sons. Decedent "contributed" to the capital stock of the partnership "all the stock in trade, book accounts, money in bank, fixtures and other property not herein specially excepted of the business heretofore carried on by him as a going concern." Good-will was not amongst the specially excepted property, which consisted of real estate, leasehold interests, patent rights, and the like, all of which the decedent leased to the partnership at certain rentals. Compensation, however (at six per cent. per annum on the book value thereof), was also to be paid to decedent for the use of the property "contributed" by him to the capital stock. The other parties contributed nothing to the capital stock, but were to receive interest on certain sums which they already had "on deposit with the business." Each partner was to receive interest on any ascertained profits left by him in the business. The profits and losses were to be shared in certain percentages. The partnership was to continue until terminated by death or withdrawal. On the death of Francis A. Hall, his personal representatives were to have the right, at their option, to become partners in his place. On the death of either of the others, the surviving partners had the right to "purchase the interest of the deceased partner." If Francis A. Hall desired to terminate the partnership he had the right to "purchase the interest" of the others, or either of them. If either of the other two desired to withdraw, the remaining two had the right to purchase his interest. "Upon and after dissolution" the exclusive right to the business use of the name Frank A. Hall, Frank A. Hall & Son, Frank A. Hall & Sons or Frank A. Hall & Co. "shall belong to and be vested in said Francis A. Hall or his personal representatives."

Some of the provisions of this agreement are peculiar and to some extent apparently contradictory. For instance, the "contribution" of the assets mentioned to the partnership as partnership capital, with the provision that decedent is to be paid annually six per cent. of their value for the use thereof. I take it, however, that under the true interpretation of the contract (which is certainly to be construed most strongly as against Francis A. Hall, the "grantor") the assets mentioned were conveyed and became the property of the partnership. The six per cent. which he is to have for the use amounts simply to an additional and perhaps a preferred share of the profits. Certainly, however, he would have an exceedingly difficult task in convincing any court, in an administration of the partnership property and affairs in insolvency or bankruptcy proceedings, that as to such six per cent. payment he was a creditor and not a partner, or that as to the property so "contributed" by him he would be entitled to the ownership and possession thereof as against a receiver or trustee, or that such receiver or trustee would not have power and right to sell it as partnership property to pay creditors. I think it is not open to question that included among these assets so conveyed was the good-will of the business. It is not specifically nor even impliedly excepted, and although not specifically mentioned as being conveyed, certainly passed with the taking over of the business and the conveyance of all of the "other property * * * of the business * * * as a going concern." *Cf. Lane* v. *Smythe, 46 N. J. Eq. 443.* Even if good-will in some sense or in some part attaches to the use of the trade name, there was here no reservation of the use of decedent's name. That passed to the partnership also, and was expressly embodied in the partnership name provided for. There is the clause as to decedent's right to the use of the name after dissolution and the provisions which give decedent or his personal representatives the right to acquire or carry on the business on the death or withdrawal of the other partners, but, undoubtedly, the good-will of the business as such became the property of the partnership. There is no evidence to show that any of the good-will in anywise inhered in any of the

patents or patent rights which were reserved in the owner-
ship of decedent.

By the agreement of 1918 the old partnership was dis-
solved and a partnership was formed among the three prior
partners and the decedent's third son, which partnership
"takes over as of this date the business heretofore conducted
by * * * Frank A. Hall & Sons." The same name is
retained. "Francis A. Hall contributes to the capital stock of
the copartnership all the stock in trade, book accounts, money
in bank, fixtures and other property of the business heretofore
carried on by him (*sic*) as a going concern," and is to receive
the same six per cent. annual compensation on the book value
of said property. The other partners contribute to the part-
nership capital the respective amounts standing to their credit
on the books of the old firm. Francis A. Hall also contributes
the real estate (which he had reserved in 1910), but reserved
and retained the patents, though licensing the use. All pat-
ents, &c., developed or acquired by the partnership "shall also
become his sole property." By another clause the amount con-
tributed by Francis A. Hall as capital is specified as $300,000,
the "balance beyond that to his credit on the books of the old
concern being repayable to him as below provided." The pro-
visions as to profits are peculiar; decedent was to receive six
per cent. on said sum of $300,000, "which as between partners
shall be treated as an expense; and in consideration of the
priority thus given him he waives all claim to further profits."
The profits—obviously over and above this six per cent.—
were to be divided among the other three partners, to the ex-
tent of eighty-five per cent. thereof, the other fifteen per cent.
to be applied each year to reduce Francis A. Hall's capital in
the firm down to the $300,000, and thereafter to be accumu-
lated as a contingency fund. "All losses shall be charged
against and borne by the partners in the same proportion in
which they share the profits as aforesaid." The agreement
also contains the same provisions in regard to termination by
death or withdrawal and the respective rights in such contin-
gencies, as the agreement of 1910. It also contains the same
clause as to the right to the name after dissolution.

So far as good-will is concerned, it seems clear to me that the situation as between decedent and the partnership was essentially the same after the agreement of 1918 as under the 1910 agreement. The new partnership was the owner of the good-will of the business (not only as it had been carried on by decedent prior to 1910, but with such changes and additions as had occurred during the carrying on of the business by the partnership); the decedent had certain rights under the partnership agreement whereby he might acquire the good-will, together with the business, or, perhaps, some portion of good-will attached to the trade name without the business.

Under this 1918 agreement decedent was of course a partner. He had a large interest, some $300,000 (by far the largest interest), in the firm's capital, at the risk of the business. He had an interest in the profits, to an amount equal to six per cent. on his share of the capital, which interest was prior to the interests of the other partners in the profits, and might be compared to the interest of a preferred stockholder in a corporation. He was chargeable with a part of the losses which were to be borne by the partners in the same proportion as they shared the profits. He had the majority control, under the agreement, "in all matters of partnership policy and action." He had also the right heretofore mentioned (to state the legal effect of it in a different form from that in which the agreement expresses it) to compel all the other partners to withdraw from the business on paying them the book value of their interests; and the right, upon any dissolution, to the exclusive use of the business name.

The agreement of May 23d, 1919, is as follows:

"By mutual agreement the copartnership heretofore existing under the name of Frank A. Hall & Sons is hereby dissolved and terminated, Francis A. Hall now retiring from said business. It is agreed that his capital as shown by the credit to him on the firm books is the amount to which he is entitled, and that the same is no longer capital invested in said business, but is a deposit to his credit, payable to him on demand or as soon as same can be realized in cash. The other partners shall have the right to continue the business under the same firm name and hereby agree to do so, their respective interests and compensation and shares in profits being in the same proportion as heretofore. The old copartnership articles shall apply except as modified by the retirement of Francis A. Hall."

It does not seem to me that there can be much dispute as to the meaning and effect of this agreement (there might perhaps be ground for argument as to whether or not the new partnership of the three sons was licensed to use the father's patents, and whether or not the father would be entitled in future to new patents, inventions or processes developed by the new firm; but that is of little moment in our present inquiry). It operates to transfer, release or surrender to the other three partners all of the rights which Francis A. Hall theretofore had in or to the partnership and the partnership business and assets; and on the other hand it releases him from liability for future obligations of the firm's business and converts him, as to the capital he has invested in the business, from a partner into a creditor. Unquestionably there was technical legal consideration, therefore, for his transfer or surrender.

That, however, does not terminate the necessity of further investigation of the transaction. It is the essential character of the transaction which is to be looked at, not the mere legal form thereof. As I had occasion to point out in *Re Bottomley, 92 N. J. Eq. 202,* the statute specifically applies to transfers made by way of bargain or sale. Appellants would scarcely contend that a transfer made in contemplation of death or to take effect at death, consisting in an exchange, with due legal formality, whereby decedent conveyed to the beneficiary securities worth $100,000 in return for a building lot worth $500, would not be taxable. The inquiry must be as to whether or not the net practical result and effect of the transaction is a substantial diminution of the assets of the decedent.

Gauged by that standard, therefore, and as to this particular point, it seems to me that the comptroller has not erred in finding a taxable transfer. By the agreement of May 23d, 1919, the decedent gained, it may be said, relief from risk of loss of his capital in the partnership, and relief from risk of loss of his own individual assets, in the hazards of the firm's business. As a matter of fact, it would seem from

the evidence that he had not terminated these legal liabilities
—that there had been no notice to the public or the firm's
creditors that his partnership had ceased.  But in any event
these were obviously technical or theoretical gains to him,
for the business had been continuously and increasingly suc-
cessful for eight years, at least, and there is nothing to show
any probability or possibility of any change in that behalf.
The same thing may be said as to his relief from the risk
of not getting his six per cent. preferred profit income on his
capital.  He gained a creditor's right as against his partners
(though this is doubtful, as I have said, as against creditors),
to withdraw his capital, but this was payable "as soon as the
same can be realized in cash," and from the record the amount
realized in cash and withdrawn by decedent, from May 23d,
1919, until his death, July 18th, was the difference between
$270,000 and $240,000, or thereabout.  But most important
of all is the fact that he could have done all this by a disso-
lution of the partnership (under the terms of the 1918 agree-
ment) without giving up the valuable rights which he did
give up by the agreement of May 23d, 1919.  He had the right
to dissolve the partnership and take over the business him-
self, paying the other partners for their shares therein, the
amounts at which they were carried on the books.  And ac-
cording to the appellants' own testimony the good-will of the
business never appeared on the books of the concern, "was
never taken into account in any shape or manner," and "was
not figured among the partners in any shape."  Admittedly
there was a good-will which would have been an item of value
on a sale of the business to outside parties.

This good-will was the property of the firm, as I have
hereinbefore pointed out.  The decedent, however, had the
right to acquire it, with the business, without paying any-
thing for it, since it in nowise figured in the book entries or
the book value of the partners' shares, and it was the latter
only which decedent would have to pay if he dissolved the
partnership and took over the business, good-will, name and
all.

The value of that right, therefore, seems to be practically equal to the value of the good-will. If decedent had wished to realize to the fullest extent on everything that he owned, he could have taken over the business, acquiring the good-will for nothing, and then sold the business, including good-will to an outside purchaser. It is of course begging the question to say that he did not want to do that and never would have done it. There is almost no possibility that he would have done so. But the important fact is that he *could* have done so up until the agreement of May 23d, 1919; and that then and thereby he, in effect, transferred to his three sons that right which he then had, and the value of which was approximately co-extensive with the value of the good-will.

The comptroller has perhaps committed a technical error in assessing under the name of "good-will of firm of Frank A. Hall & Co." this asset of decedent which was not good-will, but strictly speaking a right or interest—a right to acquire the good-will. This, however, is a mere matter of words and not of substantive error; and does not warrant a reversal. It clearly appears from the report of the comptroller's appraiser that that which was appraised was decedent's right and interest in the firm passing under and by the dissolution agreement.

Upon the second issue, as to whether or not the transfer was made by decedent in contemplation of death, I find no ground for disturbing the findings of the comptroller that it was so made. It has already been laid down in *Re Pierce, 89 N. J. Eq. 171,* that the function of this court on these appeals is not to weigh the evidence or substitute its judgment for that of the comptroller, but to determine whether or not error has been committed. So the comptroller's finding in this behalf is not to be reversed if there was before him sufficient evidence to support that finding. That there was sufficient evidence therefor is apparent from the record. It appears that decedent was seventy-four years old; that he suffered from heart trouble for several years. which was particularly serious because of his age; the nature of this trouble

was such that clearly it would within a few years result in death; it had been explained to him two or three years before his death, but he at that time made rather light of it, and refused to follow the advice to abstain from exercise; the condition of his health had nothing to do with his withdrawal from active work in the firm in January, 1918; but in April or May, 1919, he became worse, was confined to his house and never left the house thereafter; the agreement of May 23d, 1919, was proposed by himself, drawn by the same lawyer who drew his will executed three weeks later; and finally, July 18th, 1919, he died from a culmination of the same heart trouble. It may also be noted that it seems from the record that decedent had made some statements at the time of the May 23d, 1919, agreement, which might have been evidential of his intent and state of mind, and that testimony as to what those statements were was precluded by the refusal or failure of the executors and the beneficiaries to authorize the attorney to waive the attorney's privilege.

We come now to the last contention of appellants, namely, that the appraisement of the good-will or interest was erroneous and excessive and the tax computed thereon therefore likewise erroneous and excessive. As already noted, the value of the right to acquire the good-will, free, is essentially the same as the value of the good-will itself. The value of the good-will of a business is naturally not susceptible of determination with exactitude. The usual method is to take the actual annual net profits of the business for a period of years, add them and divide by the number of years, thus obtaining the average annual net profit, and then to multiply that average profit by a certain number of years. This last multiplier is called the "number of years purchase" and varies, of course, with the particular circumstances in each case. In some instances two years has been taken, in others, three, four and five. Three years purchase seems fairly well accepted as a reasonable and conservative figure in ordinary cases. *Cf. In re Ball, 161 App. Div. (N. Y.) 79.*

In the case *sub judice* the comptroller computed the average annual net profit from the net profits of the years 1916, 1917 and 1918, first deducting, however, six per cent. interest on the respective amounts of invested capital in those years, and took a "three years purchase," that is, multiplied the net average annual profit by three, and took that as the value of the good-will. The appellants take no issue with the general method or principle in arriving at this valuation, but insist that the comptroller erred in using the net profits of 1916, 1917 and 1918, to determine the average net profit, saying that those three years were abnormal because of conditions due to the world war. They contend that the years 1913, 1914 and 1915 should also have been taken in computing the average, and that the result—with a three years purchase—had this been done, would have given $63,301.68 as the value of the good-will, instead of the $135,860.76, found by the comptroller.

The question as to what years are to be taken in computing the average, is, however, a question of fact and of judgment under the circumstances and the proofs before the comptroller, and is not for the judgment of this court in substitution for that of the comptroller. *In re Pierce, supra.* Appellants fail to prove that error was committed by the comptroller under the evidence. True it is that the net profits during the years 1913, 1914 and 1915 were considerably less than during the next three years; but the record shows that the annual profits had been continuously increasing since the original formation of the partnership in 1910. Moreover, even if the profits in the years 1916-18 were abnormally large, due to war conditions, the transfer was made in the early part of 1919, and the same conditions apparently continued, inasmuch as the profits for 1919 were $118,000, as against $72,000, $67,000 and $68,000 for the previous years.

The tax will be affirmed.