Albeit the range of our transfer inheritance tax decisions is extensive, one branch of the present appeal introduces a question which in its factual and legal incidents seems to have escaped an exact adjudication in this jurisdiction.
C. Aubrey Nicklas, who was a resident of Spring Lake, Monmouth County, New Jersey, died testate on March 7th, 1942. His last will and testament dated September 5th, 1933, designated his widow and children as the recipients of his bounty. Among the securities in his possession at death were 680 shares of the capital stock of the Empire Construction Company. On June 15th, 1934, the decedent and his wife entered into a contract with the Empire Construction Company, the operative covenants of which read: "The party of the second part [Nicklas], his heirs, executors, administrators and assigns and the party of the third part [Mrs. Nicklas] specifically agree that they will sell to the party of the first part [Empire Company] the stock heretofore mentioned at the value arrived at on the basis of the above formula on demand. Likewise the party of the first part agrees to buy *Page 595 
said stock on demand of the party of the second part, his heirs, executors, administrators and assigns * * *." All other stockholders of the company approved the agreement.
In conformity with the formula specified in the agreement, the value of each share was calculated at the death of the decedent to be $146.7485. In acquittance of the covenants of the agreement, the sale of decedent's stock to the company was in fact completed by his executor on December 7th, 1942, at the formula price. Such was the value imputed to the stock by the executor in his report to the Tax Commissioner. The Commissioner does not intimate that the shares were distributable as a part of the decedent's estate. His assessment at a substantially increased value is constructed upon the conclusion that the agreement made on June 15th, 1934, and the eventual transmission of the stock in obedience to its terms, was a transfer "intended to take effect in possession or enjoyment at or after" the death of the decedent — R.S. 54:34-1, c; N.J.S.A. 54:34-1, c; that for tax purposes the sale price fixed by the agreement should be ignored and the cash value of the stock reflecting also the proceeds of an insurance policy held by the company on the life of the decedent should be adopted. R.S. 54:34-12; N.J.S.A.54:34-12.
The propriety of the present assessment is accordingly considered in the form and posture in which it is presented. It is, of course, categorical that a transfer inheritance tax is the creature of statute, and liability to such taxation must reside in the language or plain intendment of the Tax Act. If the transfer now under observation is not encompassed by our statute, the process of evaluating it for taxation is not implicated in the present appeal.
Whether or not a transfer comes into enjoyment or possession at the transferor's death is a matter of a realistic examination of the shifting of economic burdens and benefits, the actual succession to property. Was it the result of a purpose that the transferee should or might have and enjoy, after the death of the transferor, the property transmitted? Would the transfer have been made in the absence of such purpose? Squier v. Martin,131 N.J. Eq. 263; 24 Atl. Rep. 2d 865. *Page 596 
Since the statutory phrases are incapable of precise literal exposition, the factual circumstances of each case must be investigated in the process of inclusion and exclusion.MacGregor v. Martin, 126 N.J. Law 492; 20 Atl. Rep. 2d427. In its relation to inter vivos transfers, the primary object of the statute is to envelop all those which in reality are chosen substitutes for testamentary dispositions. Therefore, in each case the intrinsic nature and substantial character of the transaction should be detected to test its incompatibility with or subjection to the clauses of the statute.
The inter vivos agreement in which the decedent engaged manifestly obligated him to sell his stock to the company at any time on its demand. The agreement seems to be a valid and enforceable contract supported by mutual and reciprocal covenants. It became effective immediately upon its execution. It is not revocable. The death of the decedent was not made an event or contingency which under the contract would imperatively defer or govern the time of its performance. The agreement was enforceable against the decedent in his lifetime and against his estate in the event of his death. In it, no beneficent or donative motive is conspicuously perceptible.
A case identical in factual characteristics has not to my knowledge been adjudicated in this state. The decision of In reDeutz, 105 N.J. Eq. 671; 149 Atl. Rep. 257, does not afford guidance in determining the initial or basic point involving the taxability of the present transfer because in that case the decedent expressly provided that the transfer should take place at or after his death. The opinion of the Court of Errors and Appeals in Bente v. Bugbee, 103 N.J. Law 608;137 Atl. Rep. 552, is said to have some distant analogy because in the instant case the company could have obtained a decree against the executor commanding him to specifically complete the sale in fulfillment of the ante mortem contractual obligation of the decedent. I have before me the conclusion of the Vice-Ordinary in the appeal In re Ferris, 94 N.J. Eq. 726; 121 Atl. Rep. 692, to which counsel have not referred. That case bears a discernible resemblance in factual features to the present one. There the decedent in *Page 597 
his lifetime had contracted to sell to one Magovern shares of common stock of the Ferris Company, retaining the right to vote the stock during his own lifetime, or so long as it should be necessary to enable the decedent to maintain his majority vote in the corporate affairs of the company. The taxing authority contended "that the result of this contract was that the ownership of the shares of stock in question remained in Mr. Ferris, with a transfer thereof to Magovern, to take effect at the death of Ferris." The Vice-Ordinary stated: "It is clear to my mind that such was not the situation in fact, at least as to the entire beneficial ownership of the shares of stock." It was resolved that by virtue of the contract, an immediate transfer of the beneficial ownership or equitable ownership of the shares from Ferris to Magovern was effectuated; i.e., that Magovern owned the stock, less the voting power reserved by Ferris. The equitable principle that recognizes a vested beneficial interest in the vendee upon the execution of a contract of sale is likewise applicable to agreements for the sale of corporate stock. Martindell v. Fiduciary Counsel, Inc., 133 N.J. Eq. 408; 30 Atl. Rep. 2d 281. In the instant case, there is no lifetime reservation by the decedent of any right or power incident to the ownership of the stock, nor is the sale made subject to any contingent defeasance as in the Ferris Case.
The reported decisions of other jurisdictions have been examined, among which is the opinion of the Court of Appeals of New York, In re Fieux's Estate, 241 N.Y. 277;149 N.E. Rep. 857, delivered by Justice Crane and in which Chief-Justice Hiscock and Justices Cardozo and Lehman concurred. Justices Pound, McLoughlin and Andrews dissented. I ascribe superior cogency to that decision, not only because of the eminent jurists who intently explored the subject, but also because the New York statute was the model on which our own transfer inheritance tax legislation was patterned. In re Moore, 104 N.J. Eq. 400, 402;145 Atl. Rep. 727. Uniformity to-day in the construction and application of homogenetic statutes by the courts of neighboring states in like cases is undoubtedly opportune.
The Fieux Case reveals that the decedent and four other *Page 598 
stockholders of the Castle Realty Company, Inc., had each obligated himself by an irrevocable contract entered into upon good and valuable considerations to do two things — not to dispose of any of his stock, but to hold it intact for the benefit of the other four parties, and, second, to sell his stock at par to his associates at their election on his severance of his connection with the corporation by voluntary act or by his death.
The following quotations are extracted from the opinion: "This was not a transfer, agreement, or deed made in contemplation of death, or to take effect at death. The agreement and its binding, irrevocable obligations took effect the 3d day of July, 1918. The right to purchase the stock at par could take effect in the lifetime of the parties as well as at death. Resignation from the corporation, or death, merely marked the time when the right of purchase could be exercised.
"In this respect, the agreement is not a taxable transfer within section 220 of chapter 62 of the laws of 1909 (Tax Law [Consol. Laws, ch. 60]), as amended by chapter 430 of the laws of 1922, even if such amendment could affect rights vested under a previous contract, which we do not hold.
"Sigismund L. Fieux died on the 20th day of June, 1923, owner of 81 shares of stock of the Castle Realty Company, Inc. Maurice Fieux and Ernest D. Fieux, his brother, exercised the option to purchase the aforesaid stock at $100 per share, and paid to the estate of the decedent the sum of $8,100. The appraiser found that the stock of the corporation was of the value of $200.50 per share, which left a balance of the valuation over the amount paid to the estate of $8,140.50, which has been assessed and taxed as a taxable transfer.
 * * * * * * *
"The bargain, or the gift, to come within this Tax Law must have been made in contemplation of death, or intended to take effect in possession or enjoyment after such death. The last sentence, added by the amendment of 1922, taxing the remaining portion of the property over and above the consideration received by the estate is likewise limited to such *Page 599 
agreements made in contemplation of or to take effect at death.
"This agreement, made by the five stockholders of the Castle Realty Company, Inc., on July 3d 1918, was not a bargain made in contemplation of the death of Sigismund L. Fieux, or intended to take effect in possession or enjoyment at or after such death. The bargain became binding, and took effect at once on the date of its execution. It was irrevocable. It obligated the signer to hold his stock, and not sell or dispose of it. If he resigned from the corporation, he was compelled to sell his stock at par to the other parties to the contract, if they so elected.
 * * * * * * *
"In the case before us, Sigismund L. Fieux was held in his lifetime to keep his stock, and not sell it except to his associates. The agreement was as binding upon him in case of his resignation from the corporation as upon his estate in case of his death. It is the nature of the agreement, its intent, and purpose which must determine its classification, and whether or not it amounts to a taxable transfer."
It is significant to observe that the Court of Appeals of New York in its decision differentiated the rulings in Matter ofCory's Estate, 177 App. Div. 871; 164 N.Y.S. 956; Id., 221 N.Y. 612; 117 N.E. Rep. 1065, and Matter of Orvis' Estate, 223 N.Y. 1; 119 N.E. Rep. 88; 3 A.L.R. 1636. The respondent relies for example on the recent case, In re McLure's Estate, 347 Pa. 481;32 Atl. Rep. 2d 885, and the authorities therein cited, including the Cory and Orvis Cases. The absence in that opinion of any gesture of familiarity with the Fieux Case is unaccountable.
In many, if not in most, of the reported cases to which my attention has been attracted, and of which Commissioner ofCorps, c., v. Worcester County Trust Co., 305 Mass. 406;26 N.E. Rep. 2d 305, is typical, the court was apparently permitted or entitled to assume the taxability of the transfer and hence confined its deliberations to the proposed limitation of market value by the contract or option price. Vide, Wilson
v. Bowers, 57 Fed. Rep. 2d 682; Lomb v. Collector,82 Fed. Rep. 2d 166; Helvering v. Salvage, 297 U.S. *Page 600 106; 56 S.Ct. 375; 80 L.Ed. 511; Commissioner of InternalRevenue v. Bensel, 100 Fed. Rep. 2d 639.
I repeat that the fundamental contention of the Tax Commissioner in justification of the existing assessment is that the agreement was a transfer intended to take effect in possession or enjoyment at or after the death of the decedent. Moreover, it is asserted that the tax assessment for the payment of which the executor is liable (R.S. 54:35-2; N.J.S.A.54:35-2) is to be visited upon the Empire Company (Trans., page 13) notwithstanding its contract with the decedent. Although our statute specifically applies to transfers by bargain and sale as well as by gift, when made in contemplation of or to take effect at death, yet the imposition under our statute of a succession tax upon purchasers should be pursued with some hesitancy. The justification should be clear and definite.
I am not unconscious of the vigilance required to prevent subtle evasions of the Tax Act and the danger of frustrating the purpose of the act by ill-considered restrictions or qualifications. Nevertheless an alienation which under existing legislation is not subject to taxation is not to be mistaken for an evasion. An inter vivos transfer, even one obviously donative in purpose and essentially a gift, if complete and immediately effective, is not taxable by our statute unless it was made in contemplation of death. Squier v. Martin, supra.
Accordingly, a transfer is not taxable merely because of a disparity in favor of the transferee between the market value of the property and the contract price. True, it may at times tend to expose the genuine purpose of the transferor. Neither is a sale to be classified as a transfer necessarily intended to take effect at or after death merely because the vendor died before the complete effectuation of the bargain. The factual pedestal of the tax must be evident and firm.
The agreement has been critically scrutinized. Its recitals arouse suspicions. They impart that "the insurance was taken out by the party of the first part in order to enable it in case of the death of the party of the second part to buy in for the treasury of the party of the first part" shares of stock "so that the working assets of the party of the first *Page 601 
part might not be depleted by such purchase of stock." It is stated to be the intention "that this insurance fund shall be used to purchase the stock * * *." Counsel for the appellant proposes that the expression "insurance fund" also comprehended the cash surrender value of the policies in the event of a demand to purchase the stock during the life of the vendor. The allusions in the agreement to the death of the decedent do not escape notice. In the Fieux Case, supra, death was one of the events upon which the right to purchase could be exercised.
However, the operative part of the instrument is not ambiguous, and if both the recitals and the operative part are regarded as clear, but inconsistent with each other, the operative part is to be preferred. Bellisfield v. Holcombe, 102 N.J. Eq. 20;139 Atl. Rep. 817. The positive and unqualified obligations of the parties to perform on demand cannot be judiciously ejected from the agreement by a suspicion that they were artificial and illusory.
Although the decedent did not own a controlling block of stock of the Empire Company, his holdings, if allied with those of his wife, would constitute fifty per centum of the outstanding stock. Hence, it might be surmised that he contemplated possessing the power to restrain the company at his will from demanding a sale of the stock. This supposition rests upon the further assumption that a husband can control his wife's vote, which I am not prepared to exalt to the level of an existing prima facie
presumption of fact. The decedent was 49 years of age when the agreement was made. I am not persuaded that the agreement was intended to be testamentary in the character of its effectiveness.
Proof of a fact inheres in the probative and persuasive effect of competent and relevant evidence, and however common may be the indulgence in surmise and conjecture, judicial tribunals still exact proof. This branch of the appeal is provocative of an association of divergent ideas, but I conclude that there is a failure to adequately prove that the agreement was in fact one intended to take effect in possession or enjoyment at or after the death of the decedent within the intendment of our statute. That is the only ground *Page 602 
upon which the assessment is sought to be justified by the respondent.
 ASSESSMENT OF ROGERS COMPANY STOCK.
The appellant by the present appeal also impugns the valuation ascribed by the Commissioner to 450 shares of the capital stock of the George W. Rogers Construction Company, of which the decedent was the owner at his death. The appellant reported these shares at a valuation of $150 per share. The Commissioner appraised them at $442.59 per share, employing the book value method of appraisal and including good will as an asset of the corporation. The inequality of these valuations arises principally from the inclusion of the item of good will by the respondent and its exclusion by the appellant.
Good will, of course, is an asset. In re Bottomley, 92 N.J. Eq. 202; 111 Atl. Rep. 605; In re Hall, 99 N.J. Law 1;125 Atl. Rep. 246; affirmed, 100 N.J. Law 405; 126 Atl. Rep. 924; In reDeutz, supra. Not every corporation has such an asset. It is elusive and does not long endure independently of the enterprise and effort of the successors. Therefore, no fixed and immutable rule can be applied to its valuation in all cases. Its existence for tax purposes does not depend upon whether or not the corporation carries it as an asset on its books. In re Deutz,supra. There is a commonly accepted method of determining the value of good will which was approved by this court, In re Hall,94 N.J. Eq. 398; 119 Atl. Rep. 669, and also inferentially, in the same case by the Supreme Court on certiorari
(99 N.J. Law 1; 125 Atl. Rep. 246) and by the Court of Errors and Appeals,100 N.J. Law 405; 126 Atl. Rep. 924. The valuation by that method is determined by computing the yearly average net profit (after deducting six per cent. interest on the capital) for the normal business years previous to decedent's death and multiplying it by a multiplier called "number of years purchase," which in the particular circumstances may be from two to six years. A three-year multiplier has perhaps most frequently been accepted as a reasonable and *Page 603 
conservative figure. Cf. In re Hall, supra; In re Deutz, supra.
The five-year figure is not inordinate. Gleason Otis,Inheritance Taxation (4th ed.) 599 et seq.
The capital stock of the Rogers corporation comprised 1,000 shares, 500 of which were owned by George W. Rogers, and a like number by the decedent, subject to the qualification presently to be noted. At the decedent's death one Thomas Temple, who had served decedent as confidential secretary for many years, made claim to fifty shares of the corporation's stock for which he had an assignment duly executed by the decedent, although he did not possess the certificate. The executor, Harry W. Grell, upon application to the Orphans Court of Monmouth County (the rights of an infant being involved) was ordered, among other things, to accept the sum of $2,500 in payment of fifty shares of the capital stock of this company, and was empowered to transfer fifty shares of that stock to Thomas Temple, conditioned further upon the execution and delivery by him of a general release in favor of the estate of this decedent, his executor, or the heirs, devisees, beneficiaries, c., of the decedent.
Upon decedent's death, Rogers learned of Temple's claim to said fifty shares of stock and obtained an option at a price which does not appear in the transcript. Upon the exercise of this option the estate would have a minority interest in the corporation. Efforts of the executor to sell the stock to outside interests were fruitless. On December 28th, 1942, after negotiations extending for a period of eight or nine months, the executor sold these shares to Rogers at $175 a share. As evidence that the price realized for this stock was a fair one, reference is made to the fact that Mr. Grell, who had served as treasurer of the corporation for a period of fifteen years until his resignation on January 30th, 1943, held an option to purchase upon convenient terms the stock at a formula price determined to be $158.83, the exercise of which he declined.
The valuation of these shares of stock, according to an analysis which forms part of the record, is calculated upon a net worth of $212,159.49, to which is added the good will, which is arrived at by taking the average yearly profit, *Page 604 
$54,944.02 (after deducting interest on average capital invested at six per cent. $8,858.78) for the five full calendar years previous to decedent's death, and multiplying the result, $46,085.24, by five, for a total of $230,426.20, as the value of the good will. This sum plus the net worth totals $442,585.69. On this basis each of the 1,000 shares of stock outstanding is determined to have a value of $442.59.
The proofs have been examined and it is not evident that the judgment of the Commissioner in respect of the valuation of the stock is erroneous.
The tax levied against the estate of this decedent should be modified and corrected in accordance with these conclusions.
 *Page 1