FANNY MILBERG, AND THE BOARD OF COMMISSIONERS OF THE MAYOR AND COUNCIL OF THE CITY OF HOBOKEN, NEW JERSEY, PLAINTIFFS-APPELLANTS, v. SEABOARD TRUST COMPANY AND HUDSON COUNTY NATIONAL BANK, DEFENDANTS-RESPONDENTS.

Argued May 7, 1951—Decided May 28, 1951.

*Mr. E. Norman Wilson* argued the cause for appellant City of Hoboken (*Mr. Dominick J. Marrone,* attorney).

*Mr. Henry Milberg* argued the cause for respondent Fanny Milberg (*Messrs. Milberg & Milberg,* attorneys).

*Mr. John Milton* argued the cause for respondents Hudson County National Bank and Seaboard Trust Company (*Messrs. Milton, McNulty & Augelli,* attorneys for Hudson County National Bank. *Messrs. Burke, Sheridan & Hourigan,* attorneys for Seaboard Trust Company.)

The opinion of the court was delivered by

WACHENFELD, J. This is an appeal from a judgment in the Superior Court confirming a master's report and discharging the liquidating trustees of the Seaboard Trust Company. There is also an appeal from an order made by the court below directing the money involved in the litigation be paid into court and making allowances to the master and to counsel.

Fanny Milberg originally appealed from the final judgment and the order of the Superior Court relating to the

allowances of fees to counsel and to the master. She, however, abandoned her appeal from the order *supra* and became a respondent as to this phase of the litigation. The cause was certified here on our own motion.

The question presented arose out of the liquidation of the Seaboard Trust Company, a banking institution in Hoboken, and the query was whether or not the liquidating trustees of that company discharged the full duty cast upon them by law in accepting the bid of $1,524,523.59 for the assets sold to the Hudson County National Bank, which also assumed the liabilities of the Seaboard Trust Company. The inquiry in substance is whether or not the purchase price was fair and reasonable.

The accepted price amounted to $30.49 per share and this was coupled with an offer by the Hudson County National Bank to pay $32 per share for all stock tendered for cancellation up to July 1, 1950, which date was subsequently extended to the time of the master's hearing.

The Seaboard Trust Company came into being in 1933 as a result of the failure of the old Steneck Trust Company in Hoboken. Late in 1949, negotiations for its sale were entered into with the Hudson County National Bank resulting in the offer aforementioned. The proposal was reported to the stockholders of the Seaboard Trust Company by its board of directors, who were of the opinion that $32 a share was a fair price. There were 50,000 shares of the stock of the Seaboard Trust Company which were outstanding and as a result of the offer of the Hudson County National Bank 80 per cent of the 50,000 shares was acquired.

On April 10, 1950, at a meeting of the board of directors of the Seaboard Trust Company, a resolution for the dissolution of the Seaboard Trust Company was passed and was submitted to the stockholders at a meeting on April 27. Stockholders owning shares aggregating 39,484 voted in favor of dissolution and a certificate evidencing that fact was filed with the Commissioner of Banking and Insurance pursuant to the statute. On April 28, 1950, a certificate of the Bank-

ing Commissioner was issued, declaring that the Seaboard Trust Company should be dissolved.

On April 29, 1950, the directors of the Seaboard Trust Company, acting as trustees in dissolution, met to consider their course of action in liquidating the assets of the Seaboard Trust Company. They accepted the offer of the Hudson County National Bank to purchase the assets of the Seaboard Trust Company for the sum already stated and to assume the liabilities of the trust company.

The City of Hoboken held 6,582 shares of stock and Fanny Milberg was the owner of 18 shares. Many shares were held by other stockholders, some of whose addresses were unknown, who had not accepted the Hudson County National Bank's offer to buy at $32 per share.

Milberg and the City of Hoboken, when advised the Seaboard Trust Company was considering the matter of liquidation, made an application to the Superior Court for an order enjoining the meeting. The injunction was denied, the meeting was held, and the matter proceeded in the regular course, resulting in the appointment by the court of a master to take testimony to determine whether or not the board of directors, acting as trustees in liquidation, discharged their full duty in disposing of the assets and if the value set by them, to wit, $30.49 per share, was a fair value for the assets so disposed of.

The appellant contends the purchase price offered was not fair and reasonable because the bank building was worth more than the $75,000 valuation placed upon it in the negotiations with the Hudson County National Bank and because nothing was paid for the good will of the Seaboard Trust Company although it was a going concern, had deposits of approximately $10,600,000 at the time of its absorption, was in a liquid condition, and had been in operation for over 15 years.

As to the real estate, the appellant relies upon the testimony of an assessor of the City of Hoboken, who estimated its value to be $133,400. This figure was arrived at by the

application of a formula capitalizing rental value based on 1/10 of one per cent of the first million dollars of deposits and 1/5 of one per cent of the excess of deposits over $1,000,-000. The rarity of the acceptance of that formula was indicated by the evidence.

The Seaboard Trust Company was to be dissolved, its charter forfeited, its right to engage in banking business cancelled, and these circumstances made it at least questionable as to whether or not the formula relied upon was applicable, as the valuation so arrived at was based upon the use to which the premises were put, including as an integral part thereof the franchise granted by the State, which had then been surrendered.

The defendant's real estate appraiser, whose qualifications were not questioned, valued the property at $74,800. There was, too, the evidence of Mr. Furman, the president of the company, who testified the building was operated at a loss and the suggestion to him by one of the state bank examiners who thought the building was a burden to the bank.

The master was unimpressed by the appellants' testimony and concluded they had failed to sustain the burden of proof assumed.

The issue here is not whether the land and building were actually worth more than $75,000 but is, as set forth in the pretrial order, "whether or not the liquidating trustees * * * discharged the full duty cast upon them by law in accepting" the offer made by the Hudson County National Bank. The value of the real estate was therefore merely an item to be considered in concluding whether or not the trustees had discharged their legal responsibility.

The appellant also argues that at the time of the sale the Seaboard Trust Company was a going concern, and, while admitting that the transaction had the form of liquidation, insists a merger took place and therefore it was the duty of the trustees in liquidation to include "good will" as an asset.

For several years prior to the sale, the president of the Seaboard Trust Company had been concerned about the

future of small banks, including his own. His doubts about their ability to prosper were brought about by the fiscal policies of the government and were increased by the passage of the 1948 revision of the Banking Act by the State of New Jersey, which in his opinion seriously restricted the bank's freedom of action in making investments.

Supporting the president's apprehension, a field examiner of the Banking Department testified banking circles generally thought that sooner or later small banks would have to dissolve their activities, particularly in communities where there was strong competition, or they would have to merge with larger banks.

In *Matawan Bank v. Matawan Tile Co.*, 2 *N. J.* 116 (1949), we decided, referring to the statutes governing the dissolution of corporations:

> "By express mandate of the statute the powers of the trustees in the administration of their trust extend only to winding up the affairs of the corporation and distributing its assets and to such other matters as may be necessarily incidental to the exercise of these functions. Manifestly, such grant of powers, even in the absence of the specific legislative proscription above quoted, does not contemplate the continuation of the business of the defunct corporation."

The value of the good will of a business is naturally not susceptible of determination with exactitude, *In re Hall,* 94 *N. J. Eq.* 398 (*Prerog.* 1923), and if a corporation is to be dissolved and ceases to be a going concern, it is exceedingly doubtful whether its good will under those circumstances could be of any great value.

> "Not every corporation has such an asset. It is elusive and does not long endure independently of the enterprise and effort of the successors. Therefore, no fixed and immutable rule can be applied to its valuation in all cases." *Grell v. Kelly,* 134 *N. J. Eq.* 593 (*Prerog.* 1944).

Be that as it may, the "good will" value was not an issue in itself but was merged in the general inquiry now confronting us, as to whether or not the price received under the circumstances was fair and reasonable.

The book value of the stock in the summer of 1948 was $26 a share. Efforts had been made to dispose of the stock elsewhere but without success. The Commercial Trust Company, to which it was offered, rejected it, its president being of the opinion that Hoboken was over-banked and not a desirable field for his company to enter. There was testimony that Mr. Garibaldi, one of the largest stockholders, unsuccessfully attempted to sell the shares at $30 a share. Mr. Tighe, a vice-president, had opened negotiations with one of the better known stock brokerage houses in New York City and the best offer received was $20 a share for 26,000 shares, being slightly more than 50 per cent of the entire stock. He was also advised by another banker that there were people who were interested in purchasing not less than 26,000 shares of the stock for $30 per share, the seller, however, to pay a commission of $2 per share, which would result in a net figure of $28 a share. The efforts to better this price did not materialize. In the spring and fall of 1949, the Hudson Trust Company was approached in an attempt to interest it in the purchase of the Seaboard stock, but without result.

When the directors became trustees in liquidation, it was not intended they should continue the business of the defunct corporation. *Matawan Bank v. Matawan Tile Co., supra.* The only other alternative was liquidation as required by the statute, *R. S.* 14:13–1, *et seq.*

The courses open to the trustees were limited. They could (1) accept the offer to purchase made by the Hudson County National Bank; (2) attempt to sell the assets as a unit to someone else; (3) liquidate the assets piecemeal.

The second course had already been attempted over a considerable period of time without success.

The last course, individual salvaging, was hazardous, time-consuming, uncertain and precarious.

The master, after consideration of all the testimony and the existing circumstances, decided the trustees were justified in accepting the first proposal.

We àre in accord with that conclusion as embraced by the court below. The record shows this price to be higher than any other submitted to date and exceeded all the offers which those interested in the bank had been able to obtain at any time from any other source.

The trustees' duty under the law is not disputed. It has been defined many times, the latest expression being by this court in *Blauvelt v. The Citizens Trust Co.,* 3 *N. J.* 545 (1950):

"The conduct of the trustee then is to be measured by the principle that a trustee owes an obligation to the *cestuis* and a duty to exercise that degree of care, prudence, circumspection and foresight, that an ordinary prudent person would employ in like matters of his own. See *In re Griggs,* 125 *N. J. Eq.* 73 (*Prerog. Ct.* 1939); affirmed, *sub nom. In re Paterson National Bank,* 127 *N. J. Eq.* 362 (*E. & A.* 1940); *In re Buckelew's Estate,* 128 *N. J. Eq.* 81 (*Prerog. Ct.* 1940); *In re Ebert,* 136 *N. J. Eq.* 123 (*Prerog. Ct.* 1945); *Braman v. Central Hanover Bank & Trust Co.,* 138 *N. J. Eq.* 165 (*Ch.* 1946); *Dickerson v. Camden Trust Co., supra.* Also cf. *R. S.* 3:16–12."

The duty cast upon the directors by law, as indicated by the record, was fully discharged.

It is next urged the granting of fees contravenes *Rule* 3:54–7 as there is no fund in court; that the city attorney was not entitled to an allowance as the ordinance establishing his position precluded his receiving fees in addition to his annual compensation; and that the allowance to the master was larger than the services rendered warranted.

Section (b) of the rule permits fees where there is a fund in court, but it is asserted: "Before there could be any allowance to counsel a situation involving the payment of the fund realized on the sale of the assets would have to arise, either in the nature of a claim therefor or an action to determine who will be entitled to the fund."

This is the reasoning advanced but no authorities supporting it are submitted.

After the injunctive relief asked for was denied, the plaintiffs filed an amended and supplemental complaint. The

defendants filed a joint and several answer and counterclaim offering therein to pay into court the sum of $312,522.50. In the answer filed to this counterclaim, the plaintiffs accepted the offer on condition that their acceptance would not limit the defendants' liability, if any, to pay into court such other sums as might be determined by the court to be a fair value of the stock outstanding.

Thereafter an order was entered in which the plaintiffs' were "designated as representatives of all the owners and holders of said outstanding voting trust certificates and shares of stock." This class, on whose behalf the plaintiffs were designated as representatives to prosecute the suit and defend the counterclaim, was comprised of several hundred persons who had not surrendered their securities for payment.

In *Katz v. Farber*, 4 *N. J.* 333 (1950), interpreting the phrase in the rule "fund in court," we said:

"There may be such a fund when the money is actually in the custody of the court and is the subject of the litigation; also, by analogy, when a litigant by court intercession creates, produces or protects, as in the *Cintas* case, *supra*, a fund for the benefit of a class of which he is one so that in good conscience the cost of the proceeding should be visited in proper proportion upon the moneys which are thus produced or preserved for the members of the entire class although all did not participate in the litigation."

In *Cintas v. American Car & Foundry Co.*, 133 *N. J. Eq.* 301 (*Ch.* 1943), referred to *supra*, the court held it was sufficient if, as a result of the litigation, the fund was brought under the control of the court and that any fund which had been protected by a court for the benefit of a class was, in a broad sense, a trust fund or a common trust fund.

We think in the case *sub judice* the money so deposited constituted a fund in court, the administration of which was under the jurisdiction of the court for the benefit and protection of a particular class, payable to the members thereof proportionately to their respective shares, and the allowances made were within the sanction of our rule.

■ It is urged no allowance should have been made to the city attorney because he was employed at a fixed annual salary under an ordinance which provided: "he shall receive no extra compensation or fees for his services."

This ordinance applies and is limited to his contract and relation with the municipality itself and might well prevent him from obtaining additional fees which were to be paid out of municipal funds. Here, however, he acted not only for the plaintiff but also for the class the plaintiff had been designated by the court to represent in this litigation. The ordinance and his contract of employment do not restrict a court of competent jurisdiction in the exercise of its proper judicial functions and discretion in granting him an allowance, otherwise lawful and proper, for his services as counsel to a class on whose behalf he appeared and prosecuted the action pursuant to the order of the court.

■ Lastly it is urged that the allowance to the master was exorbitant and should not have exceeded the joint allowance made to counsel for the municipality and to Milberg.

The sum allowed is discretionary and is based upon the reasonable value of the services rendered, considering the time spent, the amount involved and the importance and complexity of the issues determined. The importance and difficulty of the issues encountered are apparent from the record. The fund in court was $269,714,54 while the proceeds of the sale of the assets totalled $1,524,523.59. We cannot say that the fees allowed under these circumstances were of such proportion as to require revision here.

A motion was also made to dismiss the appeal as not within time. It has little merit and becomes of no importance in view of the decision rendered here.

The motion to dismiss is denied and the judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.