FRANK J. FARLEY, PLAINTIFF-RESPONDENT, v. JOHN E. MANNING, COLLECTOR OF INTERNAL REVENUE, ACTING FOR AND ON BEHALF OF THE UNITED STATES OF AMERICA, FOR THE FIFTH DISTRICT OF NEW JERSEY, DEFENDANT-RESPONDENT, JOSEPH V. MORIARTY, DEFENDANT, MARGARET MORIARTY, DEFENDANT-APPELLANT, AND UNITED STATES OF AMERICA, DEFENDANT-RESPONDENT.

Argued April 24, 1950—Decided May 22, 1950.

*Mr. Harry A. Walsh* argued the cause for appellant, Margaret Moriarty (*Mr. Robert H. Wall,* attorney).

*Mr. Roger M. Yancey,* Assistant United States Attorney, argued the cause for respondents, United States of America and John E. Manning (*Mr. Alfred E. Modarelli,* United States Attorney, *Mr. Theron Lamar Caudle,* Assistant Attorney General, *Mr. Andrew D. Sharpe* and *Mr. F. A. Michels,* Special Assistants to the Attorney General, on the brief).

The opinion of the court was delivered by
WACHENFELD, J.   A raid by the agents of the Attorney General was made on July 9, 1946, on the residence of Joseph Moriarty, where he lived with his mother and sisters. Moriarty

eluded the officers, went to the top floor of the building by means of a ladder through a trap door carrying and occasionally dropping bundles containing what subsequently proved to be cash, most of which was in small bills, $2,055 being in bills of one dollar denomination. He attempted to make his escape over the housetops and adjoining roofs but was stopped at the point of a gun. Currency amounting to $27,001.50 was seized under circumstances that will be referred to hereafter.

Moriarty was arrested and subsequently indicted in Hudson County on a charge of conducting a lottery on the premises raided. He was acquitted, however, by a trial jury on March 15, 1947. Joseph and his sister, Margaret, pursuant to the statute, then served notice on the Hudson County Treasurer demanding the return of the money seized at the time of the raid. The Collector of Internal Revenue filed a lien for delinquent income taxes, penalties and interest on the property belonging to Joseph Moriarty. The amount of the lien exceeded the amount of the money seized.

Moriarty and his sister both having demanded payment and the Collector of Internal Revenue likewise having demanded payment, the County Treasurer filed a bill of interpleader in the then Court of Chancery alleging doubt concerning the respective rights of the various claimants to the seized money and prayed that the claimants be interpleaded with respect to their claims. An order of restraint was issued enjoining the claimants from instituting or continuing any proceedings to recover the sum seized.

Margaret Moriarty filed an answer to the interpleader suit claiming she owned the greater portion of the money so seized, to wit, $26,794. Joseph Moriarty filed an answer stating he made no claim excepting for the sum of $207.50, which he alleged was illegally taken from his person at the time of the arrest and raid. The United States of America was permitted to intervene and filed an answer setting forth its claim for delinquent income taxes against Joseph Moriarty, reciting the perfecting of the lien and alleging that the fund in court

which came into possession of the County Treasurer belonged to Joseph Moriarty.

· The officers who participated in the raid testified they found number slips, horse race betting data and various papers relating to gambling activities throughout the house. With respect to the ownership of the money seized on the raided premises, the testimony of Government witnesses consisted of their finding the lottery slips and other evidences of gambling, the locating of the steel ammunition box containing several large bundles of money in a bedroom closet located on the top floor of the house, an attempt by Moriarty to bribe some of the officers and to escape with part of the money which he removed from the ammunition box, delivery of a key by Moriarty to one of the raiding agents and the making of statements by him to state agents admitting ownership of all the money seized in the house.

Margaret Moriarty sought to sustain her claim for the money in question saying that on the day of the raid she left the house in the early morning and did not return until evening to learn for the first time the raid had taken place and that the money which she claimed to be hers had been taken from the ammunition box. Queried concerning the source of the money seized, she stated that the greater part thereof was given to her by her godfather over a period of years prior to his death in 1930 and the balance represented gifts and savings which she had accumulated. She could not give details with reference to the exact amount of the gifts but approximated sums which she thought were received. She usually kept the key to the box in a dresser drawer in her bedroom.

The appellant contends the testimony relied upon by the respondent was clearly hearsay and the court below placed total ownership in Moriarty upon mere conjecture and an unwillingness to believe her.

We need not make a further analysis of the evidence here submitted. In the disposition below, the court, referring to the facts and circumstances involved, said:

"Miss Moriarty's story of the acquisition and storage of this large sum of cash in small denominations is so fantastic, so highly improbable, that I find it incredible. Her testimony is contradicted in certain respects by Mr. Grossi and by undisputed or admitted circumstances, such as the presence of number slips in the ammunition box, the key for it not in her personal possession but on the key ring of her brother Joseph, and the maintenance by her of small bank accounts and a safe deposit box in which she kept only War Bonds of comparatively small value. The large number of bills of small denominations is more consistent with the Government's contention that it was used in a number gambling business, rather than with Miss Moriarty's contention of a hoarding operation."

██ Coupling these observations of the facts with and considering the many admissions against interest made by Moriarty, particularly the following taken directly from the record: "He (Moriarty) said, 'Can I look at you fellows counting that money? After all it is my money and I want to see how much I got there,'" we think there is little room for doubt as to the ownership of the money and are satisfied that it was the property of Joseph Moriarty. One would be naive indeed to come to a converse conclusion. No facts, reasons or authorities have been submitted sufficient to induce us to change the factual conclusions made below.

The appellant urges further, however, that the action of the Treasurer in filing an interpleader suit was unauthorized and invalid and the court without jurisdiction to entertain it, basing her contention almost entirely upon Chapter 70 of the Laws of 1941, *R. S.* 2:178–7.1 to 7.5, and upon the assertion that the money deposited with the Treasurer of Hudson County was not subject to a lien for delinquent federal income taxes.

The act referred to provides what shall become of currency seized by police in connection with arrests for unlawful gaming, who shall keep custody of it, and how it shall be disposed of in the event of acquittal or conviction. Section 4 specifies that, where the proceedings shall terminate in favor of the person arrested, the person claiming said money shall make an application to the court, giving notice thereof to the County Treasurer, for an order directing the currency or cash to be

the property of such person and ordering the same to be returned by the County Teasurer.

There is nothing in the statute directly or by inference attempting to deprive our court of its broad equity jurisdiction to determine on interpleader the title to money which is the subject of conflicting claims and is in the possession of one who has no interest therein, nor is there anything in the act indicating such was the legislative intent.

■ The statute has no such sweep or scope as suggested by the appellant and no authority is cited in support of the view so advanced. We cannot read into the enactment a prohibition against a customary and usual equitable procedure where none is mentioned or recited.

■ As to the contention that the money in question was not subject to a lien for delinquent incomes taxes, Section 3670 of the Internal Revenue Code, entitled "Property Subject to Lien," specifically states what property shall be covered:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount   *   *   *   shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

Section 367 of the Revised Statutes of the United States, 5 *U. S. C. A.*, § 316, directs how the interest of the United States shall be protected in pending litigation in state jurisdictions by reciting that the proper Government representative may attend to the interest of the Federal Government in any suit pending "in any of the courts of the United States, or in the courts of any state."

The theory that there could be no federal lien because these moneys might revert to the county has little weight in view of the disclaimer by the County Treasurer stipulated in the record.

■ Lastly it is urged a counsel fee should have been awarded to the attorney for the appellant. The case involves a fund in court and an allowance of a counsel fee is authorized under *Rule* 3:54–7 but the granting of such counsel fee is a

matter of discretion with the trial court and will not be disturbed on review unless there is an abuse of discretion. We discern no such abuse here.

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD and BURLING—6.

*For reversal*—None.