STATE OF NEW JERSEY, BY THEODORE D. PARSONS, AT-
TORNEY-GENERAL OF THE STATE OF NEW JERSEY,
PLAINTIFF-RESPONDENT, v. OTIS ELEVATOR COM-
PANY, A CORPORATION, DEFENDANT-APPELLANT,
ABRAHAM GRENTHAL, SUBSTITUTED RECEIVER OF
J. B. SKEHAN & CO., DEFENDANT-RESPONDENT,
AIDA M. RHODES, INDIVIDUALLY AND AS EXECU-
TRIX OF THE WILL OF FRANK C. RHODES, DEFEND-
ANT.

Argued September 22 and 30, 1952—Decided March 16, 1953.

(1)

*Mr. Waldron M. Ward* argued the cause for the appellant Otis Elevator Company (*Messrs. Pitney, Hardin & Ward,* attorneys; *Mr. Robert P. Hazlehurst, Jr.* and *Mr. Arthur J. Martin, Jr.,* on the brief).

*Mr. Aaron Van Poznak,* specially appointed by the Attorney-General, argued the cause for the respondent State of New Jersey.

*Mr. Sol Phillips Perlman* argued the cause for Abraham Grenthal, substituted receiver of J. B. Skehan & Co.

The opinion of the court was delivered by

VANDERBILT, C. J. The State of New Jersey instituted this action in the Chancery Division of the Superior Court pursuant to the provisions of the Escheat Act (*L.* 1946, *c.* 155, as amended and supplemented; *N. J. S. A.* 2:53–15 to 32; now *N. J. S.* 2A:37–11 to 28), alleging that the Otis Elevator Company had in its custody or possession certain personal property, described in general terms only, that had escheated to the State. As provided in *N. J. S. A.* 2:53–21, the Otis Elevator Company was ordered by the court to answer the complaint, to retain all escheatable personal property then in its custody or possession until the further order

of the court and to disclose to the plaintiff in its answer such information regarding such escheatable personal property as was pertinent and would cause a speedy determination of the action. After successive stipulations extending the time to answer until the final disposition by this court of the test case of *State v. Standard Oil Co.*, 5 *N. J.* 281 (1950), affirmed 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951), the Otis Elevator Company filed its answer setting forth all the information called for by the order of the court, including detailed schedules showing the names and last known addresses of the record owners of all unclaimed personal property in its custody or possession together with the nature and amounts of such property. In addition in its answer the Otis Elevator Company asserted various defenses relating to the jurisdiction of the court, the constitutionality of the Escheat Act, and the applicability of the statute of limitations.

According to the answer of the Otis Elevator Company, the bulk of the unclaimed personal property in its custody or possession consisted of stock registered in the name of Frank C. Rhodes. Claim to this stock was made by Abraham Grenthal, substituted receiver of the firm of J. B. Skehan & Co., in an independent action instituted in New York against the Otis Elevator Company and Mrs. Frank C. Rhodes, as executrix of the estate of her deceased husband. The institution of the New York action occasioned an amendment of the complaint filed in this escheat proceeding so as to include Grenthal and Mrs. Rhodes as parties defendant; an amendment of the answer filed by the Otis Elevator Company setting forth as an additional defense the possibility that it might be subject to double liability; and the filing by Grenthal of an answer to the amended complaint claiming the Rhodes' stock. Default was entered against Mrs. Rhodes for failure to answer. At the hearing the Grenthal claim was fully litigated, but the Otis Elevator Company, although it had raised various defenses in its answer, did not contest the escheat of any of the personal property sought by the State.

The judgment of the court entered on March 3, 1952, disallowed the Grenthal claim; declared all the personal property reported by the Otis Elevator Company in its answer to have escheated to the State and directed that it be turned over to the State Treasurer; discharged the Otis Elevator Company of all liability with respect to the escheated property; and directed that the State Treasurer pay out of the escheated property a counsel fee of $7,000 plus costs and disbursements to the attorney who had prosecuted the action for the State, a fee of $2,788.30 as a reward to the escheator, and a fee of $100 to the officer appointed by the court to take depositions. The request of the Otis Elevator Company for the allowance of reasonable counsel fees and disbursements was denied. So much of this judgment as disallowed the claim of Grenthal to the Rhodes' stock has been affirmed by this court on a separate appeal, *State v. Otis Elevator Company*, 10 *N. J.* 504 (1952). The present appeal by the Otis Elevator Company seeks a review of only that portion of the judgment denying its request for the allowance of counsel fees and disbursements.

Two main questions are presented on this appeal: may an allowance of counsel fees be made to a defendant in proceedings under *N. J. S. A.* 2 :53–15 *et seq.* to escheat personal property and, if so, should an allowance have been made to the defendant Otis Elevator Company?

I.

This is the first case in which it has been contended that counsel fees are a matter of substantive law. From the outset in New Jersey, following English precedents, the allowance of costs and counsel fees had been uniformly considered by the courts of this State to be a matter of procedure rather than of substantive law. *Rader v. Southeasterly Road District*, 36 *N. J. L.* 273 (*Sup. Ct.* 1873); *Murphy v. Brown & Co.*, 91 *N. J. L.* 412 (*Sup. Ct.* 1918); *Igoe Brothers v. National Surety Co.*, 112 *N. J. L.* 243 (*E. & A.* 1934); *Robinson v. Jackson,* 14 *N. J. Misc.* 866 (*C. P.* 1936);

*Savitt v. L. & F. Construction Co.*, 124 *N. J. L.* 173 (*E. & A.* 1940), affirming 123 *N. J. L.* 149 (*Sup. Ct.* 1939). In accordance with this uniformly accepted view the Supreme Court, in the exercise of the rule-making power over practice and procedure granted it by *Article VI, Section II, paragraph* 3 of the *Constitution of* 1947, promulgated *Rule* 3:54–7 relating to counsel fees to be effective September 15, 1948, coincidentally with the Judicial Article of the Constitution. *Rule* 3:54–7 in its original form provided that no fee for legal services should be allowed in the taxed costs or otherwise, except in (a) matrimonial actions, (b) out of a fund in court, (c) in uncontested actions for the foreclosure of mortgages, or (d) "as provided by these rules or by law with respect to any action, whether or not there is a fund in court." On January 21, 1949, paragraph (d) of the rule was amended by adding the qualification that "the authority, heretofore vested in the Court of Chancery for the granting of counsel fees in causes generally, is hereby superseded."

In the case of *John S. Westervelt's Sons v. Regency, Inc.*, 3 *N. J.* 472 (1950), the Supreme Court first had occasion to consider the constitutionality, meaning and effect of the rule. It there unanimously held (at *pp.* 477–478):

"The rule as originally written is not ambiguous when considered as a whole. It was adopted in the exercise of the rule-making power relating to practice and procedure conferred upon the Court by *Article* VI, *Section* II, *paragraph* 3 of the *Constitution of* 1947. It was plainly designed to be self-contained and exclusive. The cited amendment' [of paragraph (d)] of the rule makes clear the purpose to supersede in this regard the powers of the old Court of Chancery, not the statutory authority lodged in the Chancery Division of the Superior Court by force of subdivision (d) of the rule as appellant would construe it. The amendment was but a clarification of the original purpose, not an amendment of that purpose. * * * The phrase 'by law' is operative *in futuro;* it has no retrospective significance; it was not intended that the conflicting preexisting statutes should remain in force. The rule covers the field to the exclusion of all else."

The next case dealing with the rule was *Katz v. Farber*, 4 *N. J.* 333 (1950), where it was held "There is a fund in court 'where the court has jurisdiction over the fund or

estate'" (at *p.* 344). Then came *Liberty Title & Trust Co. v. Plews,* 6 *N. J.* 28 (1950), where we held (at *p.* 44):

"In *Rule* 3:54–7 this court has specifically. enumerated the types of actions in which allowances to counsel may be made, and the discretion of the trial court is limited to the granting or denying of allowances in such actions."

As of the time of the decision in *Liberty Title & Trust Co. v. Plews, supra,* in addition to permitting an allowance of counsel fees in the types of actions and situations hereinbefore specifically mentioned in paragraphs (a), (b), (c), and (d) of *Rule* 3:54–7, an allowance of counsel fees was also permitted by *Rule* 1:2–28 on appeals in certain cases (made applicable to the Appellate Division of the Superior Court by virtue of *Rule* 4:2–6); by *Rule* 2:12–1 providing for the allowance of reasonable compensation to assigned counsel in murder cases; and by *Rule* 5:2–5, providing for the allowance of counsel fees on workmen's compensation appeals. Shortly after *Liberty Title & Trust Co. v. Plews, supra,* was decided, the Supreme Court on December 7, 1950 again amended *Rule* 3:54–7 by deleting from paragraph (d) the words "or by law." The effect of that amendment was to bar an allowance of counsel fees in all cases except those specifically provided for in the rules themselves, thereby completely eliminating any statutory basis for such an allowance. It is readily apparent, therefore, that authority for the allowance of counsel fees is to be found exclusively in *Rule* 3:54–7. For the sake of completeness it should be noted that *Rule* 3:54–7 was last amended effective January 1, 1952, by the addition of paragraph (e) dealing specifically with the allowance of counsel fees in probate actions.

That *Rule* 3:54–7 now constitutes the exclusive source of authority for the allowance of counsel fees was most recently reiterated by the Supreme Court in *Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433 (1952), where it was stated (at *p.* 495):

"But even if there were no statutory obstacle to the allowance of counsel fees to the plaintiffs, none can be granted in this case

because the allowance of fees is a matter of procedure governed by rule of court and there is here. no 'fund in court' or other basis within the provisions of *Rule* 3 :54–7 warranting an allowance."

Such, then, was the state of the law with respect to the allowance of counsel fees on March 4, 1952, when the court below entered its judgment in the instant case denying the request of the defendant Otis Elevator Company for the allowance of reasonable counsel fees and disbursements. It should be noted in this regard that the allowance of costs and. counsel fees, being a matter of procedure, is governed by the state of the law at the time of the entry of the judgment, *John S. Westervelt's Sons v. Regency, Inc., supra* (at *p.* 479) ; *Liberty Title & Trust Co. v. Plews, supra* (at *p.* 44).

Before proceeding to a consideration of the question as to whether *Rule* 3 :54–7 authorizes an allowance of counsel fees to the defendant Otis Elevator Company in the instant case it is necessary to consider the meaning and effect of ·*N. J. S. A.* 2 :53–23. The pertinent portions of this section of the Escheat Act provide as follows :

"Before so depositing the proceeds of said escheated property in the public fund, he [the Treasurer of the State of New Jersey] shall deduct therefrom five per centum (5%) of the moneys so received and shall pay the same to the escheator as a reward for having supplied the information and evidence upon which the escheat has been successfully prosecuted and shall pay such other fees and costs as the decree shall direct.

The Court of Chancery [now the Chancery Division of the Superior Court] shall, in its final decree, fix the fees and expenses of the attorney or counsellor who shall have prosecuted the escheat in the Court of Chancery [now the Chancery Division of the Superior Court]. The fees and expenses shall be deducted from the moneys received by the State Treasurer or from moneys realized by him from the sale of said personal property and shall be paid by him as directed by said decree."

It is the contention of the State that this statute provides the necessary authorization of an allowance of counsel fees to the attorney specially appointed by the Attorney-General to prosecute the escheat, but that it fails to authorize an allowance to counsel for the defendant and, therefore, none

can be awarded to him. This argument is obviously without merit, for it is based upon the premise, previously demonstrated herein to be false, that the allowance of counsel fees is a matter of statute rather than exclusively a matter within the rule-making power of the Supreme Court.

*N. J. S. A.* 2:53–23, however, is not without its effect. *Chapter* 20 of the Laws of 1944 (*N. J. S. A.* 52:17A–1 *et seq.*) establishing a Department of Law in the State Government (*N. J. S. A.* 52:17A–2) administered by the Attorney-General, imposed on the department the duty, among others, to "Attend generally to all legal matters in which the State * * * is a party or in which its rights or interests are involved" (*N. J. S. A.* 52:17A–4g). It provided that no member of the department "shall receive any compensation, fees or costs in addition to his regular salary for or by reason of any service performed by him for the State * * * except by allowance or appropriation by the Legislature" (*N. J. S. A.* 52:17A–10). It further provided that "No special counsel shall be employed for the State * * * except by authority of the Attorney-General, and then only with the approval of the Governor, and provided that appropriations have been made therefor, unless the matter be of such an emergency and shall be so declared by the Governor" (*N. J. S. A.* 52:17A–13). Thus, when the Escheat Act was adopted two years later (*L.* 1946, *c.* 155), unless special provision had been made therein the Attorney-General would have been without authority to appoint special counsel to prosecute proceedings thereunder and he or his representatives would have been prohibited from receiving any allowance of fees that the former Court of Chancery might otherwise have been empowered to award, see *Driscoll v. Burlington-Bristol Bridge Co., supra* (at *p.* 494). *N. J. S. A.* 2:53–23, while it cannot constitute the basis for the award of counsel fees in escheat proceedings, does have the effect of removing the statutory obstacles theretofore existing so as to permit the court to make an award of fees to counsel for the state in escheat proceedings in the event that such an award is authorized by *Rule* 3:54–7.

Does *Rule* 3 :54–7 authorize an allowance of counsel fees in proceedings under the Escheat Act? Quite obviously it does not unless there is a "fund in court" within the meaning of paragraph (b) of the rule. This court has had several occasions to consider the question of when there is a "fund in court," *Katz v. Farber, supra; Farley v. Manning*, 4 *N. J.* 571 (1950); *Milberg v. Seaboard Trust Co.*, 7 *N. J.* 236 (1951); *Driscoll v. Burlington-Bristol Bridge Co., supra; In re Koretzky*, 8 *N. J.* 506 (1951); *Haines v. Burlington County Bridge Commission*, 8 *N. J.* 539 (1952); *Janovsky v. American Motorists Insurance Co.*, 11 *N. J.* 1 (1952). None of these cases, however, is immediately dispositive of the question in the instant case.

In construing *Rule* 3 :54–7 and paragraph (b) thereof it is to be borne in mind that the purpose of the rule limiting the kinds of cases in which counsel fees might be allowed was to eliminate the abuses of the power to grant counsel fees that prevailed under the former practice in the Court of Chancery. As pointed out in *Janovsky v. American Motorists Insurance Co., supra*, in promulgating the rule "this court adopted the philosophy, long accepted in the federal courts, that the interests of sound judicial administration will be best advanced by having every litigant bear his own counsel fee except in a few specially designated situations." And in *Liberty Title & Trust Co. v. Plews, supra*, this court stated (at *p.* 44) :

"It was not contemplated that the rule would or could be completely dispensed with in individual cases under the provisions of *Rule* 3 :1–2."

The court below was of the opinion that there was a fund in court, since the purpose of the Attorney-General in bringing the action in behalf of the State was "to create or preserve a fund for the benefit of a class," the people of New Jersey, citing *Cintas v. American Car & Foundry Co.*, 133 *N. J. Eq.* 301 (*Ch.* 1943), modified 135 *N. J. Eq.* 305 (*E. & A.* 1944). This conclusion is entirely sound, but one does not need to find a class to support the doctrine of a

fund in court. In *United States v. Equitable Trust Co.*, 283 *U. S.* 738, 51 *S. Ct.* 639, 75 *L. Ed.* 1379 (1930), fees were awarded to the counsel of the next friend of an incompetent Indian whose property had been dissipated with the approval of the Secretary of the Interior; see *Katz v. Farber, supra,* 4 *N. J.* 333 (1950), and cases there cited.

■ There is another equally compelling reason, arising out of the very nature of escheat, for holding that there is here a fund in court. In *State v. Standard Oil Co.*, 5 *N. J.* 281 (1950), affirmed, 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951), this court stated (at *p.* 297):

"In modern usage 'escheat' signifies the falling of property to the sovereign for want of an owner; and this category embraces not only property which has no other owner, but also property whose owner or whose owner's whereabouts is unknown. Under the common law of England escheats came to be classified as 'another branch of the king's ordinary revenue.' *Blackstone's Comm.* 302. What was originally an incident of tenure is now an incident of sovereignty. *Matthews v. Ward*, 10 *Gill. & J.* (*Md.*) 443, 451; *In re Melrose Avenue*, 234 *N. Y.* 48, 136 *N. E.* 235, 23 *A. L. R.* 1233 (1922). The doctrine of escheat, at the early common law operative only upon that which was the subject of tenure, since it related to the reversionary right of the lord to take for want of a tenant, was eventually extended to include personal property, tangible and intangible. The principle was that the right to take that which belonged to no one appertained to the Crown, as *jura regalia*. *Dyke v. Walford*, 5 *Moo. P. C.* 434, 13 *Eng. Rep. Full Reprint* 557. The Crown steps in to take the property because it is vacant. Property described as *bona vacantia* is taken or assumed by the State, as its own. Property of this class falls 'to the Crown as a matter of right in the exercise of its sovereign power.' *Re Barnett's Trust* (1902), 1 *Ch.* (*Eng.*) 847, 3 *B. R. C.* 198. 'In personal estates, which are allodial by law, the King is last heir where no kin.' Lord Mansfield in *Burgess v. Wheate*, 1 *W. Bl.* 123, 96 *Eng. Rep. Full Reprint* 67, 10 *Eng. Rul. Cas.* 614 (1884). Property escheats to the State as part of the common ownership. *Hamilton v. Brown*, 161 *U. S.* 256, 16 *S. Ct.* 585, 40 *L. Ed.* 691 (1896); *Sands v. Lynham*, 27 *Grat.* (*Va.*) (1876), 291, 295. 'With tenures abolished, succession is by like right whether the subject of escheat is personal estate or real.' *In re Melrose Avenue, supra.*"

It thus appears that an escheat action is one by which the State comes into court seeking an accounting of property of which it is the residual owner and a judgment as to its

title thereto. The complaint, using the language of the statute (*N. J. S. A.* 2:53–21), alleges that certain property "has escheated to the State" and seeks discovery and an accounting of all such property in the possession or custody of the defendant. It is well recognized that in an action such as this in the nature of an accounting the property is brought within the control of the court and constitutes a "fund in court" within the meaning of *Rule* 3:54–7(*b*). *Cintas v. American Car & Foundry Co.*, 133 *N. J. Eq.* 301 (*Ch.* 1943); see *Milberg v. Seaboard Trust Co.*, 7 *N. J.* 236 (1951).

## II.

Having shown that the allowance of counsel fees has always been deemed a matter of procedure in this State, that the sole source of authority for the allowance of counsel fees where there is a fund in court is *Rule* 3:54–7, and that there is a fund in court, it remains to consider certain arguments advanced by this State.

First it is argued that the rule of *Westervelt's v. Regency, Inc., supra*, 3 *N. J.* 472, 478 (1950) ("The rule [3:54–7 as to counsel fees] covers the field to the exclusion of all else."); the rule of *Katz v. Farber, supra*, 4 *N. J.* 333, 344 (1950) ("There is a fund in court 'where the court has jurisdiction over the fund or estate' "); and the rule of *Winberry v. Salisbury*, 5 *N. J.* 240, 255 (1950) ("The rule-making power of the Supreme Court is not subject to overriding legislation, but * * * is confined to practice, procedure and administration") must give way when the State is a party to the action. In such cases it is maintained the Legislature may prescribe the procedure and that such legislatively prescribed procedure may be in conflict with the rules of court relating to practice, procedure and administration and will override the rules of court. We can find no basis in law or equity for such a view, but on the contrary we cannot but regard such a suggestion as fraught with great inconvenience, because it would lead to two systems of procedure, one for

ordinary litigation, the other for litigation involving the State. Indeed, in this view the Legislature might prescribe as many different systems of procedure as there are or might be proceedings to which the State is a party, thus defeating the objectives of uniformity, simplicity and flexibility that are the goals of our new procedural system and that it is conceded throughout the country have been in large measure achieved here. If the doctrine urged on us were accepted, it might even be extended to all criminal trials because the State is necessarily a party.

But far more important than the procedural difficulties of a rival or even a multiple system of practice and procedure is the grave substantive danger of conceding to the State a preferred position in the courts as a plaintiff. One of the signal triumphs of the common law as distinguished from continental systems of jurisprudence is that for centuries it has been a recognized principle that everyone is subject to the rule of law and that no man is above or beyond the law. Said Bracton, the greatest of the early writers on English common law, *"Rex non debet esse sub homine sed sub deo et sub lege quia lex facit regem."* ("The king should not be under any man but under God and under the law, because the law makes the king.") *De Legitus et Consuetudinibus Angliae, I. 8. s. 5*; 4 *Publications, Selden Society, Select Passages from the Works of Bracton and Azo* (edited by Maitland, London, 1895). See also Lord Coke's use of this passage in his celebrated encounter with James I. *Prohibitions del Roy,* 12 *Coke Rep.* 63, 65, *77 English Reprint* 1342, 1343 (1612). This principle long had an exception in substantive law:

"(1) The rule that the King can do no wrong; (2) the procedural rule that the King cannot be sued in his own courts—a rule derived from feudal days when a lord could not be sued in his own court." *Wade and Phillips, Constitutional Law (London, 1950),* 309.

In England, however, this exception has gradually disappeared; property has long been recoverable from the Crown by a petition of right; contract obligations enforced against

the Crown since 1860, *idem,* and "with important exceptions the *Crown Proceedings Act,* 1947, *sec.* 2, establishes against the Crown liability in tort as if it were a private person of full age and capacity; it can be made liable for the torts of its servants or agents," *Idem* 312.

In this State; as in this country generally, the doctrine of the infallability and the nonsuability of the sovereign lingers on in the guise of the doctrine of sovereign immunity. This doctrine is applied, however, to suits against the State, but it has no application to suits such as this brought *by* the State. In this case the State is coming into court to assert its derivative, residual rights to the personal property of unknown or absentee owners, *State v. Standard Oil Co., supra,* 5 *N. J.* 281, 297 (1950). Its standing is neither greater nor higher than that of the unknown or absentee individual owners. The State as a plaintiff in such circumstances does not stand in any preferred position over any citizen. Seeking equity in the form of an accounting and a judgment of title, the State must, like every other suitor in equity, itself do equity. This fundamental principle that the State itself is as much subject to law as any private citizen grows in practical importance as the State in modern times constantly assumes more functions and greater activities with respect to its various functions:

Next it is contended by the State that even though the court has the right to exercise the rule-making power, it should, out of comity, yield to legislative provisions as to procedure in cases where the State is concerned. The rule-making power of the Supreme Court, however, is not a privilege to be exercised by it at its option; on the contrary, it is a duty that the justices of the Supreme Court must exercise as part of their constitutional obligations in cases involving the State quite as much as in private litigation, the language of the Constitution making it clear:

"The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts." *Const.* 1947, *Article* VI, *Section* 2, *paragraph* 3.

They called on committees of experts to make an initial draft of the rules; they submitted the tentative draft of the rules to the entire bench and bar; and they have continued the process by providing in *Rule* 1:7–3 for an annual judicial conference, "to consider improvements of procedure in the courts." The Judicial Conference is made up of all the judges except the municipal magistrates, the leaders of each branch of the Legislature, the Attorney-General and the 21 county prosecutors, the dean of each approved law school, the state bar examiners, the officers and trustees of the State Bar Association, the president of each county bar association, 60 delegates from the bar appointed by the president of each county bar association in the same proportion as members of the General Assembly, and ten laymen appointed by the Chief Justice. Months before the annual conference request is made by publication in the *New Jersey Law Journal* and by letters to the bar associations for suggestions for improving the rules of court. Special committees are frequently appointed to report on topics of major difficulty. These reports and all suggestions are carefully considered and debated *pro* and *con* at the Judicial Conference. Thereafter the justices undertake the arduous work of considering and passing on each recommendation. Rule-making is by all odds the most difficult task they have assigned to them. They realize that a very large part of the progress that has been made by the new judicial establishment springs from the improvements in practice, procedure and administration prescribed by the new rules of court. They therefor regard the rule-making power not only as an arduous task but also as a high responsibility that rests upon them continually year after year. They know full well that any judicial system that rests on its laurels will soon stagnate.

We agree that within constitutional limits the courts should cooperate with the Legislature in serving the public. In *Massett Building Company v. Bennett*, 4 *N. J.* 53, 59 (1950), we have listed 21 different types of nonjudicial functions that they perform as legislative agents at the express request of the Legislature expressed in appropriate

statutes. Indeed, few states have gone further in this direction. In doubtful situations we have not hesitated to yield to the power of the Legislature in a spirit of comity. Thus in the exercise of our exclusive jurisdiction over the admission of members of the bar and in the absence of any legislation on the subject, we fixed the fees to be paid by applicants for admission to the bar examinations, *Rule* 1:8–8(2). Thereafter the Legislature by *L.* 1948, *c.* 390, *R. S.* 2:16–64, presented a different schedule of fees. We thereupon promptly conformed our rule to the statute in recognition of the primacy of the Legislature in fiscal matters, even within a field of the Supreme Court's exclusive jurisdiction. Such examples might be multiplied. But we cannot accede to the argument that the court may divide its constitutional duty with respect to rule-making with any other branch of government because the State is a party or interested in the outcome of litigation, or that it may shirk or abdicate its constitutional responsibility in the name of so-called judicial deference.

The *Constitution of* 1947 wisely superseded the common law prerogative writs and substituted in place thereof proceedings in lieu of prerogative writs in civil matters *"as of right," Article VI, Section V, paragraph* 4, chiefly because, among other reasons, "It was thought, too, that the right to sue out a prerogative writ should not be dependent on obtaining the *allocatur* of a court or of a justice thereof. It was believed that the allowance of a prerogative writ should not be a matter of judicial discretion any more than the filing of a bill in equity or the issuance of a subpoena to answer," *Ward v. Keenan,* 3 *N. J.* 298, 304 (1949). Similar consideration should stay our hand here in developing the federal doctrine of judicial deference which has been employed by the United States Supreme Court on occasion to prevent individuals and sovereign states alike from having constitutional questions of the greatest moment adjudicated. The classic examples of such results are *Massachusetts v. Mellon,* 262 *U. S.* 447, 43 *S. Ct.* 597, 67 *L. Ed.* 1078 (1923), where the doctrine was invoked to prevent both Massachu-

setts and an individual taxpayer from obtaining an adjudication as to the constitutionality of the Maternity Act which could be justified only under the general welfare provision of the Federal Constitution, and *Ashwander v. Tennessee Valley Authority*, 297 *U. S.* 288, 56 *S. Ct.* 466, 80 *L. Ed.* 688 (1935), where the stockholders of a corporation sought to test the validity of a contract between their corporation and the Tennessee Valley Authority. The victory of the people in supplanting the judicial discretion that controlled the granting of the old prerogative writs will prove illusory indeed if it merely gives place to the much criticized federal doctrine of judicial deference. We will do well to avoid falling into the same error in this state. On the other hand, we must and do realize that our work as a judicial establishment is always subject to the will of the people; if we do not do our task well, they can and should and undoubtedly would make such changes that they may think wise by way of constitutional amendment.

Then it is urged by the State that the Escheat Act would be unconstitutional if it did not contain procedural provisions. It is undeniable that all judicial proceedings, whether originating in the common law or in statute, are necessarily subject to the constitutional requirements of procedural due process. But that does not mean that in judicial proceedings authorized by statute the procedure must be provided by statute where, as in this State, matters of practice and procedure have been committed to the courts by constitutional mandate. If the Legislature prescribes a new right, the court has the corresponding duty to set up the procedure for its enforcement, if one does not already exist. It would, however, defeat the desired objectives of simplicity and flexibility in procedure, if statutory procedures might be engrafted on the rules of court.

In fact, the Legislature has taken precisely this view of our rule-making responsibility in two comprehensive revisions. Sensing the undesirability of the commingling of substantive and procedural law in *Title 2* of the *Revised Statutes* dealing with the administration of civil and criminal

justice and in *Title* 3 dealing with the administration of estates, the Legislature in June 1950, appointed an Advisory Committee on the Revision of Statutes (*L.* 1950, *c.* 171) to revise these two titles comprising about one-sixth of the total bulk of the *Revised Statutes* and to delete the procedural matter therein, and on December 5, 1951 it enacted the recommendations of its Advisory Committee as *Titles 2A* and *3A* of the *Revised Statutes* (*L.* 1951, *cc.* 344, 345). Again, in June 1952 it appointed a Legislative Commission on Statute Revision to perform a similar task with respect to the remaining 56 titles of the *Revised Statutes* (*L.* 1952, *c.* 11) and on February 9, 1953 it enacted the recommendations of its Advisory Committee as S. 1 to S. 54 and these bills are now before the Governor for executive action. Likewise, the Governor has consistently supported the rule-making power of the Supreme Court by vetoing legislation encroaching thereon; see the vetoes of S. 58 (1947–1949, *p.* 103); S. 237 (1950, *p.* 76); A. 87 (1950, *p.* 38); A. 256 (1950, *p.* 49); and A. 634 (1952, *p.* 113), in *Veto Messages of Hon. Alfred E. Driscoll, Governor of New Jersey.*

Finally, it is insisted that the State may escheat personal property administratively without judicial action. With this view we find ourselves in complete disagreement. Court action has been uniformly required in escheat proceedings. If the State may appropriate property other than contraband to its absolute use without compensation, a great and unbounded inroad on private property rights will have made its way into the law without any constitutional warrant.

### III.

There being a fund in court out of which an allowance of counsel fees might be made under *Rule* 3:54–7(*b*), the question is next presented as to whether the court below abused its discretion in denying the allowance of a reasonable counsel fee to the defendant Otis Elevator Company while at the same time granting a substantial allowance to counsel for the State. Three reasons were advanced by the trial

court for denying the defendant's request: (1) the fund must be preserved in as full measure as possible for the use of the State; (2) the Escheat Act indicates a willingness on the part of the Legislature to compensate counsel for the State but not counsel for the defendant; and (3) there is a danger in these cases that an allowance of counsel fees will inspire a show of legal activity without reasonable justification. The first and third reasons call as much for a denial of an allowance to counsel for the State as to counsel for the defendant, and the second reason is the result of a misinterpretation of *N. J. S. A.* 2:53–23. As we have previously pointed out, this section merely has the effect of lifting the statutory restrictions on the Attorney-General or his representatives receiving an allowance when otherwise permitted. It was not intended to deny an allowance to counsel for the defendant; indeed, it specifically provides that "the Treasurer of the State of New Jersey * * * shall pay such other fees and costs as the decree shall direct."

The nature of proceedings under the Escheat Act is such that in the ordinary case of personal property the defendant is plainly entitled to an allowance of counsel fees where it assists in creating the fund in court. Here it is important to note the difference in escheating personal property and real property. In the escheat of real property pursuant to our former statute *R. S.* 2:53–1 *et seq.*, in effect at the time of the commencement of this action, the burden of the proceedings was placed upon the State. When the Attorney-General had reason to believe that a person seized of real estate had died intestate and without heirs, he was required to cause a writ of inquisition to be issued directed to the sheriff and commanding him as follows:

"* * * we command you, that, by the oath of twelve good and lawful men in your county, you diligently inquire what lands, tenements and hereditaments the said .......... was seized of at the time of his death, if any; and what estate of inheritance, and when he died, and whether he made any, and what, devise thereof, and whether he left any heir, and, if he did, who is his heir, and what is the clear yearly value of such lands, tenements and hereditaments; * * *." (*R. S.* 2:53–1)

If any occupant of the affected real estate or any person aggrieved traversed the inquisition, a trial was ordered and the burden was on the State to "prove all such matters as are requisite in judgment of law to establish the escheat" (*R. S.* 2:53–5).

Contrast this practice with respect to the escheat of real property with the procedure prescribed for the escheat of personal property. There the burden of inquisition and proof is lifted from the State and thrust by the statute on the defendant. The complaint against a person suspected of having custody or possession of escheatable personal property need only be in general terms, yet the defendant may be required by court order

"to furnish to the Attorney-General, or his deputy appointed to prosecute the action, all information such person having possession of such personal property may have with relation to the last-known address of any person having any interest in, together with any other information relating to, such personal property." (*N. J. S. A.* 2:53–21).

The defendant may not default or leave the State to its proof, but the court shall

"Make an order requiring the defendant to answer the petition within a time therein limited. Such order shall contain such other directions as the court may deem appropriate for the speedy determination of the cause, the protection of the property, or for the disclosure of information pertinent to the prosecution of the cause." (*N. J. S. A.* 2:53–21).

If any person lays any claim to the property sought to be escheated, he is required to

"file his claim in the general form of an answer to the petition, which answer shall set forth in such detail as the court may require why the answering party contends that the property mentioned in the petition should not escheat to the State." (*N. J. S. A.* 2:53–22).

And in the event a claim is made to the property sought to be escheated the burden is not upon the State to prove the escheat, but it is the "claimant's burden of clearly establishing by competent evidence that he was the rightful owner

and presently had a valid claim as such," see *State v. Otis Elevator Company*, 10 *N. J.* 504, 510 (1952), *supra*, which deals with a claim made in the instant escheat proceeding.

It is thus apparent that a complaint under the Escheat Act with respect to personal property is an extraordinary proceeding, in which the defendant is required to perform the duty that would otherwise fall upon the State of furnishing all the information necessary to give substance to and support the complaint. In these circumstances the statute places the laboring oar in the defendant's hands and without any wrongdoing on its part commands it to produce the appropriate proof that in the ordinary course of judicial proceedings would come from the plaintiff. In these circumstances it is only equitable that when it comes to the allowance of counsel fees the defendant be given at least as favorable consideration as the State.

In these escheat proceedings, as no doubt is the situation in most such proceedings, the efforts of the defendants were not devoted exclusively to the furnishing of information in furtherance of the State's claim to the personal property in its possession or control. While at the hearing it did not contest the escheat, in its answer it did raise certain defenses which, if valid, would have defeated the escheat. It is therefore essential in this, and in other similar proceedings, that the trial court in determining whether to make an allowance of counsel fees to the defendant and in fixing the amount thereof consider what portion of the defendant's efforts redounded to the benefit of the State and, in the event the escheat is actually contested at the trial, whether the defendant had reasonable justification for so doing. Obviously if a defendant should make a mere "show of legal activity," as the court below feared, the court would be justified either in denying a counsel fee altogether or even in assessing the costs of the proceeding against it. In the instant case we are of the opinion that the court below, by reason of its misinterpretation of the force of *N. J. S. A.* 2:53–23 and *Rule* 3:54–7, *supra*, abused its discretion in denying any allowance of counsel fees to the defendant Otis

Elevator Company, but on the basis of the record before us we are not prepared to say what would be a reasonable allowance. The amount of the fee can best be determined by the court in which the services were rendered.

## IV.

The judgment appealed from is reversed insofar as it denied the defendant's request for the allowance of reasonable counsel fees and disbursements and the cause is remanded to the Chancery Division of the Superior Court for the purpose of making an allowance to the defendant in accordance with the views expressed in this opinion.

JACOBS, J. (dissenting). The Escheat Act of 1946 appropriates to the State, for the common good, personal property which has been abandoned by its rightful owner. Its validity is no longer questioned. *State v. Standard Oil Co.*, 5 *N. J.* 281 (1950), affirmed 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951). As I read its terms, it embodies a positive legislative policy against dissipation of the escheated property through payment of counsel fees and costs to its custodian. This policy has been consistently honored by our trial courts and in none of the many escheat judgments which the State has obtained since 1946 was such allowance made. The result of the majority's decision is to strike down this policy and adjudge that the trial judge who honored it had abused his discretion; since I find no persuasive reason for this action, I respectfully dissent.

## I.

When the Escheat Act was enacted the Legislature was fully aware of the problem of costs and counsel fees. Thus, it expressly provided that from the escheated property the State Treasurer shall pay 5% to the escheator and the fees and expenses, to be fixed by the court, of the attorney who prosecuted the action for the State. *N. J. S. A.* 2:53–23; *N. J. S.* 2A:37–21. It deliberately omitted any provision for

payment of fees and expenses to the defendant custodian but did provide that costs shall not be imposed *against* the defendant except where it has resisted the proceeding "without reasonable cause or justification." *N. J. S. A.* 2:53–25; *N. J. S. 2A*:37–23. The overriding legislative purpose seems fairly evident; insofar as practicable, the abandoned property should be available to the State without diminution, thus lessening the burden of general taxation on its people; while the escheator and the attorney for the State may be entitled to be paid out of the property they have recovered for the State, the defendant custodian is not in a similar position and should not be permitted to expend it, in whole or in part, through charges for counsel fees and costs. In context, the provision directing the State Treasurer to pay the escheator and "such other fees and costs as the judgment shall direct" simply refers to permissible fees and costs within the act, such as those expressly allowable to the attorney for the State. *N. J. S. A.* 2:53–23; *N. J. S. 2A*:37–21. See *State v. Otis Elevator Co.*, 19 *N. J. Super.* 107, 110 (*Ch. Div.* 1952).

The Administrative Director reports that from 1946 to February 11, 1953, 559 escheat proceedings were instituted; 286 of these resulted in final judgments for the State, 197 were still pending and 76 were dismissed; and in no instance did the trial court ever allow costs or counsel fee to the defendant custodian. This practical construction is meaningful (*Cino v. Driscoll*, 130 *N. J. L.* 535, 540 (*Sup. Ct.* 1943)); and it is not without significance that although escheat acts are now common throughout the states they generally omit provision for the allowance of costs or counsel fee to the custodian, and no decision by any court in New Jersey or elsewhere, sustaining such an allowance, is cited by the majority. To the contrary, see *State v. First Wisconsin National Bank of Milwaukee*, 250 *Wis.* 107, 26 *N. W. 2d* 161 (1947), where the Wisconsin Supreme Court found no difficulty in setting aside a trial court's allowance of counsel fee to a defendant bank in a proceeding to escheat abandoned bank deposits.

## II.

The majority opinion takes the position that the allowance of counsel fees and disbursements is entirely a matter of practice and is exclusively governed by *Court Rule* 3:54–7. It relies upon decisions which related to controversies between private litigants and involved no escheat or comparable statutory policy. In the instant matter, we are not dealing with the allowance of counsel fees and costs in ordinary litigation between private parties. *Cf. Jersey City v. Kelly*, 134 *N. J. L.* 240, 245 (*E. & A.* 1946). We are dealing with abandoned property which, for want of a known owner, has passed to the State for the public good. The State has set up a complete method for its recovery and has declared all of the specific rights with respect thereto. It has directed that out of the property a certain amount shall be paid to the escheator, an additional amount shall be paid to the attorney for the State, and the balance shall be paid "into the general funds of the state." Whether any others shall share in the State's property would hardly be a simple matter of practice as distinguished from substantive right; at least it would present mixed elements of substantive right and procedure in a field which is of primary and special legislative concern. See *Cohen v. Beneficial Industrial Loan Corp.*, 337 *U. S.* 541, 559, 69 *S. Ct.* 1221, 1231, 93 *L. Ed.* 1528, 1543 (1949), where Justice Rutledge rightly pointed out that "in many situations procedure and substance are so interwoven that rational separation becomes well-nigh impossible."

The doctrine of judicial supremacy in rule-making, announced in *Winberry v. Salisbury*, 5 *N. J.* 240, 255 (1950), has received considerable attention in academic circles. Dean Pound recently came to its defense (Pound, *Procedure Under Rules of Court in New Jersey*, 66 *Harv. L. Rev.* 28 (1952)), whereas others have questioned its constitutional basis and social implications. See Kaplan and Greene, *The Legislature's Relation to Judicial Rule-Making; An Appraisal of Winberry v. Salisbury*, 65 *Harv. L. Rev.* 234 (1951); Heckel, *Constitutional Law*, 6 *Rutgers L. Rev.* 27,

29 (1951). In any event, it represented an important departure from traditional constitutional concepts, both federal and state, and its ultimate vindication may well rest upon the measure of self-restraint in its application. *Cf.* Stone, J., in *United States v. Butler*, 297 *U. S.* 1, 78, 56 *S. Ct.* 312, 80 *L. Ed.* 477, 495 (1936).

In *Como Farms, Inc. v. Foran*, 6 *N. J. Super.* 306, 317 (*App. Div.* 1950) Judges Bigelow and Donges joined me in the suggestion that the doctrine of judicial supremacy in rule-making ought, as a matter of comity towards the Legislature, be accompanied by fair recognition of important statutory policies in fields which are of special legislative concern. In taking a contrary approach the majority reject basic philosophies which have guided able judges in the past in their statesmanlike development of a strong and independent, though coordinate, judicial branch of government. One need but read the "political questions" cases including the opinions of Chief Justice Taney in *Luther v. Borden*, 7 *How.* (*U. S.*) 1, 12 *L. Ed.* 581 (1849), Chief Justice White in *Pacific States Telephone and Telegraph Co. v. Oregon*, 223 *U. S.* 118, 32 *S. Ct.* 224, 56 *L. Ed.* 377 (1912), and Chief Justice Hughes in *Coleman v. Miller*, 307 *U. S.* 433, 59 *S. Ct.* 972, 83 *L. Ed.* 1385 (1939), the "foreign relations" cases including the opinion of Justice Clarke in *Oetjen v. Central Leather Co.*, 246 *U. S.* 297, 38 *S. Ct.* 309, 62 *L. Ed.* 726 (1918), and the "judicial deference" cases listed in the separate opinion of Justice Brandeis in *Ashwander v. Tennessee Valley Authority*, 297 *U. S.* 288, 341, 56 *S. Ct.* 466, 80 *L. Ed.* 688, 707 (1936) to recognize how effectively the United States Supreme Court has availed itself of the instrument of self-limitation in appropriate circumstances. See 2 Warren, *The Supreme Court in United States History* (1928), 193, 722; Finkelstein, *Judicial Self-Limitation*, 37 *Harv. L. Rev.* 338 (1924); Weston, *Political Questions*, 38 *Harv. L. Rev.* 296 (1925); Finkelstein, *Further Notes on Judicial Self-Limitation*, 39 *Harv. L. Rev.* 221 (1925). Compare the famous dissenting opinion of Justice Stone (joined by Justices Brandeis and Cardozo) in *United States*

*v. Butler, supra,* where he poignantly noted that while the other branches of government are always subject to judicial restraint the only check on the court's assertion and exercise of power is its "own sense of self-restraint."

In our State we find direct precedent for the view advanced in the *Como Farms* case. Thus, although our former Supreme Court admittedly had paramount rule-making power in its constitutional prerogative writ jurisdiction, it wisely gave recognition to reasonable legislative policies bearing on the exercise of that jurisdiction. See *Owen v. Atlantic City,* 125 *N. J. L.* 145, 147 *(Sup. Ct.* 1940) ; *Traphagen v. Township of West Hoboken,* 39 *N. J. L.* 232, 237 *(Sup. Ct.* 1877) ; Case, J., in *Winberry v. Salisbury, supra,* at *p.* 261. The majority refer to recent legislative revisions which have eliminated statutory provisions which were strictly procedural; it is noteworthy, however, that in these revisions the Legislature did not alter its policy relating to costs and counsel fees in escheat matters but, on the contrary, expressly reasserted it. See *N. J. S.* 2A:37–21; *N. J. S.* 2A:37–23, effective January 1, 1952. In view of the particular issue before us it may, at this juncture, be well to remind ourselves that in our democracy the executive and legislative branches of government are the ultimate guardians of the "welfare of the people in quite as great a degree as the courts." Holmes, J., in *Missouri, Kansas & Texas Railway Co. of Texas v. May,* 194 *U. S.* 267, 270, 24 *S. Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904).

### III.

When the new rule relating to counsel fees was under consideration in 1948 a choice of philosophies was presented to the court. Some advocated that counsel fees should be liberally available to successful litigants, particularly where the claim or defense of the losing litigant had no reasonable basis. See Goodhart, *Costs,* 38 *Yale L. J.* 849, 872 (1929) ; McCormick, *Counsel Fees and Other Expenses,* 15 *Minn. L. Rev.* 619, 625 (1931) ; 53 *Col. L. Rev.* 78, 94 (1953). But *cf.* Satterthwaite, *Increasing Costs to be Paid by Losing*

*Party,* 46 *N. J. L. J.* 133 (1923). Others advocated that rigid restrictions be placed on the entire practice of judicial allowance of counsel fees, and pointed to the serious abuses and adverse public effects which had accompanied the practice in the Court of Chancery and elsewhere. This latter view was adopted by the court in *Rule* 3:54–7 which prohibits the judicial allowance of counsel fees except in a few specially designated situations. See *Janovsky v. American Motorists Insurance Co.,* 11 *N. J.* 1 (1952). When the Legislature sought to enlarge these situations it was met with a veto bearing the comment that it "would revive an unhappy practice that has been generally repudiated." See *Veto Messages of Hon. Alfred E. Driscoll, Governor of New Jersey* (1950), p. 76:

Rule 3:54–7 permits counsel fees in matrimonial, foreclosure and probate actions and "out of a fund in court." We are not concerned with the reasons which underlay the exceptions in favor of matrimonial, foreclosure and probate actions; we are, however, concerned here with the reason for the fund in court exception and its proper scope. In *Katz v. Farber,* 4 *N. J.* 333 (1950), Justice Case dealt with the subject at length but none of his illustrative instances bears on escheat proceedings. Obviously the fortuity that the litigation concerns and may result in the transfer of specific property and incidental accounting is no basis for departing from the principle that each litigant shall bear his own counsel fee; accordingly, it is clear that in specific performance, replevin, rescission and comparable adverse proceedings no allowance may generally be made under *Rule* 3:54–7. See *Janovsky v. American Motorists Insurance Co., supra; Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433, 495 (1952). Where, however, a party creates or preserves a fund not solely for the benefit of himself but for the benefit of a class whom he represents, it is only just that the others bear their fair share of the cost of the litigation. In the language of the leading case of *Trustees v. Greenough,* 105 *U. S.* 527, 532, 26 *L. Ed.* 1157, 1160 (1882), "they ought to contribute their due proportion of the expenses which he

has fairly incurred. To make them a charge upon the fund is the most equitable way of securing such contribution." See *McCormick, supra,* at *p.* 622; Note, *Allowance of Attorneys' Fees from a Fund in Court,* 35 *Col. L. Rev.* 740 (1935). To the same effect see *Cintas v. American Car & Foundry Co.,* 133 *N. J. Eq.* 301, 303 (*Ch.* 1943), affirmed 135 *N. J. Eq.* 305 (*E. & A.* 1944):

"The rule which applies to the matter before me is that a court of equity will, in the exercise of sound discretion, order an allowance of counsel fees, payable out of a fund, to a complainant or directly to his counsel where he has, at his own expense, either maintained a successful suit for the preservation, protection or increase of a common fund, or brought into court a fund in which others, similarly situated, may share. This custom or practice originated in the English courts and was based on the theory that the others who benefit should, in good conscience, bear their fair share of the burden of the litigation. *Daniell's Ch. Plead. & Prac.* (*6th Am. ed.*) *1377; 14 *Am. Jur. tit. 'Costs'* §§ 70, 73, 74; 15 *C. J. tit. 'Costs'* § 210; 49 *A. L. R.* 1150 *et seq.;* 107 *A. L. R.* 749 *et seq.; Trustees v. Greenough,* 105 *U. S.* 527; 26 *L. Ed.* 1157; *Sprague v. Ticonic National Bank, supra.* [307 *U. S.* 161, 59 *S. Ct.* 777, 83 *L. Ed.* 1184]; *Merwin, Eq. & Eq. Plead.* § 1018."

Until today this court has strictly limited the fund in court rule in keeping with its underlying purpose. Thus in *Driscoll v. Burlington-Bristol Bridge Co., supra,* it disallowed counsel fee to the prevailing plaintiffs in an action to rescind an illegal purchase of property by a public body, pointing out that the proceeding was "not an action to create or preserve a fund for the benefit of a class of which the plaintiffs are representatives." Similarly, in *Haines v. Burlington County Bridge Commission,* 8 *N. J.* 539, 542 (1952), it disallowed counsel fee to the plaintiffs in a taxpayers' action, holding that "The fact that property which is the subject of litigation is under the control of the court through the issuance of temporary restraints" does not create a fund in court. And more recently in *Janovsky v. American Motorists Insurance Co., supra,* it declined to allow counsel fee to a plaintiff who tendered a fund into court and sought a determination as to whether he or the defendant was entitled to it, noting that "the plaintiff's proceeding was not an action to

create or protect a fund for the benefit of a class which he represented." If the parties in these cases were justly denied counsel fee, how can it fairly be said that the trial court abused its discretion in disallowing counsel fee under the following facts presented to it in the instant matter?

The defendant Otis Elevator Company was in possession of corporate stock and dividends which had been unclaimed and abandoned for over 14 years by their unknown owners. The State duly instituted its action in the owners' stead, and while it was pending this court sustained the constitutionality of the Escheat Act and its application to such abandoned property. Nevertheless, the defendant *thereafter* filed an answer which asserted that it had "acquired a vested and absolute right" to the abandoned property, relied upon the statute of limitations, and attacked the constitutionality of the act and the jurisdiction of the court. In an amended answer filed *after* the United States Supreme Court had affirmed the decision of this court the same defenses were reasserted. Indeed, I do not find in the record any formal withdrawal of its defenses or its groundless claim to the property on its own behalf, although apparently it did not press its claim at the trial. In view of the foregoing, the defendant was hardly in any better position than are losing claimants generally. See *Janovsky v. American Motorists Insurance Co., supra; West v. St. James' Episcopal Church,* 83 *N. J. Eq.* 324, 326 (*E. & A.* 1914). In the *West* case Justice Parker, after noting that costs and counsel fees are ordinarily denied to unsuccessful claimants of funds in court, aptly suggested that a contrary doctrine would "encourage unnecessary and frivolous litigation."

In *State v. First Wisconsin National Bank of Milwaukee, supra,* the Wisconsin Supreme Court, in denying counsel fee to the respondent bank in a proceeding to escheat abandoned bank deposits, said [250 *Wis.* 107, 26 *N. W. 2d* 162]:

"The sections in the statutes regulating costs do not warrant the allowance asked for by respondent. Nor does the rule apply which permits a court under some circumstances to make an allowance out of a fund created or preserved at the expense of a party or where a

"common fund is brought into court. The bank has not created this fund; it has done little more to preserve it than it was already bound to the depositors to do."

The same may be said of the defendant Otis Elevator Company. It was the custodian of property which rightfully belonged to unknown owners. These owners might have appeared at any time and in that event the defendant would have been obliged to remit without any deduction whatever and, indeed, might perhaps have been chargeable on the unclaimed dividends which, after the lapse of three years, it had placed in its general account and had benefited from over these many years. When the State replaced the unknown owners it acquired their rights in full, not in part. The defendant may not assert that it was placed under a special burden of searching its records for it was under pre-existing obligation to maintain current records for the owners until payment or other legal discharge. Furthermore, it may be noted that corporations, such as the defendant, are now frequently called upon to maintain voluminous records to aid government in realizing sums due as taxes and for other public purposes; whatever burden is entailed is amply justified by the consequent advancement of the public interest.

The majority assert that "it is only equitable that when it comes to the allowance of counsel fees the defendant be given at least as favorable consideration as the State." No appeal was ever taken from the allowance to the attorney for the State and we are not concerned with it, although it seems clear that the respective allowances have no relation to each other. The defendant is seeking payment from property belonging to someone else, namely, the State. On the other hand, the State did not seek payment from anyone else's property but simply requested the trial court to fix a reasonable amount payable from its own property. Perhaps it would have been politic for the Legislature to have omitted provision for special attorneys for the State and allowance to them. But that is exclusively a matter of legislative judgment and furnishes no basis for judicially initiating the practice of allowing counsel fees to custodians in escheat

matters with consequent impairment of state revenues and incipient perils, remindful of a vanishing phase in history. See *State v. Otis Elevator Co., supra,* at *p.* 112.

I would affirm the judgment entered in the Chancery Division.

HEHER, J. (dissenting). The statutory proceeding for the "escheat" of the enumerated tangible and intangible personal property (*L.* 1946, *c.* 155, as amended; *N. J. S: A.* 2:53–15 *et seq.*) is *sui generis;* and the rights and interests of the parties necessarily depend upon the provisions of the act itself.

At common law, abandoned personal property was not escheatable, but was subject only to the right of appropriation by the sovereign as *bona vacantia.* The State has the same right of appropriation except as limited by the State's Constitution and laws and the due process provision of the Fourteenth Amendment to the Federal Constitution. "Escheat" in modern usage signifies the falling of property to the sovereign for want of an owner; the term comprehends not only property which has no other owner, but also property whose owner or whose owner's whereabouts is unknown. The common law of England classifies escheat as "another branch of the king's ordinary revenue." *Blackstone's Comm.* 302. The right to take that which belonged to no one appertained to the Crown, as *jura regalia.* Property described as *bona vacantia* is taken or assumed by the State, as its own. Property of this class "falls to the Crown as a matter of right in the exercise of its sovereign power;" it escheats to the State as part of the common ownership. *State v. Standard Oil Co.,* 5 *N. J.* 281 (1950), affirmed *sub nom. Standard Oil Co. v. New Jersey,* 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951); *Roth v. Delano,* 338 *U. S.* 226, 70 *S. Ct.* 22, 94 *L. Ed.* 13 (1949); *Connecticut Mutual Life Insurance Co. v. Moore,* 333 *U. S.* 541, 68 *S. Ct.* 682, 92 *L. Ed.* 863 (1948); *Anderson National Bank v. Luckett,* 321 *U. S.* 233, 64 *S. Ct.* 599, 88 *L. Ed.* 692 (1944); *Security Savings Bank v. California,* 263 *U. S.* 282,

44 *S. Ct.* 108, 68 *L. Ed.* 301 (1923). The policy of the State's superior right under the doctrine of *bona vacantia* was described by Blackstone as the avoidance of "that strife and contention, which the mere title of occupancy is apt to create and continue, and to provide for the support of public authority in a manner the least burthensome to individuals." *Blackstone's Comm.* 298.

The State may proceed administratively to take property of this class into its protective custody, subject to eventual escheat; but where, as here, the property is subjected to escheat through the judicial process, there must needs be compliance with the requirements of due process. And it may be conceded that the exercise of the sovereign right of protective custody of property apparently abandoned or unclaimed is dependent upon due process where the property is adversely held, although some form of proceeding on notice would ordinarily be necessary to bring the abandoned property to possession. Here, the act is designed to effect an escheat by the judicial process; and the provision of procedural due process in the subjection of property *bona vacantia* to escheat is in essence a legislative function; it is the course of proceedings by which such property is reduced to possession and the title of the unknown or missing owner foreclosed, and therefore an integral part of the escheat process itself. *State v. Standard Oil Co.*, cited *supra; Provident Institution for Savings v. Malone*, 221 *U. S.* 660, 31 *S. Ct.* 661, 55 *L. Ed.* 899 (1911); *Security Savings Bank v. California*, cited *supra; Connecticut Mutual Life Insurance Co. v. Moore, supra; Anderson National Bank v. Luckett, supra; Roth v. Delano, supra; Mullane v. Central Hanover Bank & Trust Co.*, 339 *U. S.* 306, 70 *S. Ct.* 652, 94 *L. Ed.* 865 (1950).

By its very nature, such procedural due process is not within the exclusive rule-making function conferred upon the Supreme Court by *Article VI, Section II, paragraph 3* of the *Constitution of 1947*, as interpreted in *Winberry v. Salisbury*, 5 *N. J.* 240 (1950); nor does the statutory denial of a counsel fee to the custodian of the property liable to

escheat infringe the constitutional authority of the Supreme Court to regulate practice and procedure.

As just said, abandoned personal property falls to the sovereign for want of an owner; and the corollary is that the right of escheat is exclusively the State's, enforceable only at the instance of the State, and upon such conditions as the State by the legislative authority shall ordain. It would seem to be fundamental that the Legislature, in the exercise of its sole province to provide for the escheat of abandoned property, must also, as an inseparable incident or facet of the power, condition the judicial declaration of escheat upon such notice and hearing as it may deem politic and appropriate to the nature of the proceeding and in keeping with the reasonable demands of due process. Not only that; the Legislature may also provide, as was done here, for a claim of property by the unknown or missing owner before and after the judgment of escheat, reasonably conditioned as to time and otherwise, and the procedure for the prosecution and establishment of the claim. The line that separates the substantive from the procedural is not always distinguishable; and where the adjective blends into the substantive, there is substantive unity which precludes separation in assessing the rule-making jurisdiction. A rule of court cannot enlarge or diminish jurisdiction, nor can it modify, abridge or enlarge the substantive rights of litigants. *United States v. Sherwood*, 312 *U. S.* 584, 61 *S. Ct.* 767, 85 *L. Ed.* 1058 (1941); *Washington Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 *U. S.* 629, 44 *S. Ct.* 220, 68 *L. Ed.* 480 (1924). The mode of acquiring jurisdiction in this field and the substantive rights of the parties litigant and their enforcement are within the legislative province. The statute defines the court's jurisdiction to entertain the suit; the exercise of the jurisdiction is subject to the terms of the grant. Compare *United States v. Sherwood*, cited *supra*.

Such, I submit, is the principle of *Wuchter v. Pizzutti*, 276 *U. S.* 13, 48 *S. Ct.* 259, 72 *L. Ed.* 446 (1928), applying the Fourteenth Amendment. And see *Standard Oil Co. v.*

*New Jersey,* cited *supra,* where Mr. Justice Reed for the Federal Supreme Court said that the case there in hand differed from *Wuchter v. Pizzutti,* "since it is not here attempted to validate a defective statutory provision for notice by recourse to the sufficiency of the notice which, although not required by statute, was in fact given. Here it is the statute itself, as interpreted by the state court, which requires what we think is adequate notice." [341 *U. S.* 428, 71 *S. Ct.* 826.]

In a word, the conditions attending the enforcement of the sovereign's right of escheat and the proceedings to perfect the escheat are so intimately related to the substantive process as to be inseparable from it. It is a special statutory proceeding for the declaration of escheat, conditioned as provided by the State itself; the conditions are of the substance, and not procedural within the concept of the cited constitutional grant of authority to the Supreme Court touching matters of practice and procedure.

It is within the province of the Legislature, in the protection of its own revenue, to provide for disclosure and transfer of property subject to escheat without the benefit of a counsel fee to the custodian of the property or the record of its ownership. And this is what the Legislature has done here.

This is not a suit between private parties alone, but a proceeding by the State to take over abandoned property, for its care and protection at the outset, and ultimately its appropriation as the State's own. The Legislature has plenary power to enforce the sovereign right of property; and to this end it may provide the mode and method of exercising the State's right of escheat, subject to the requirements of due process, and take all reasonable measures against its undue diminishment. It is well within the legislative authority to lay upon the custodian of personal property *bona vacantia* the duty of disclosure and surrender without fee or compensation for the act.

The State is not subject to the rules of court relating to the exercise of jurisdiction *in invitum* or the imposition of costs or counsel fees.

The sovereign is not suable, directly or indirectly, without its consent, manifested by legislative action or by waiver. *Gallena v. Scott,* 11 *N. J.* 231 (1953). And the principle also precludes the assessment of a counsel fee against the State in favor of the custodian of abandoned property.

There is sovereign immunity from costs. The State as a party litigant in its own courts is not liable for costs, absent a statute expressly giving rise to such liability. *Deneen v. Unverzagt,* 225 *Ill.* 378, 80 *N. E.* 321 (*Sup. Ct.* 1907); *State v. Williams,* 101 *Md.* 529, 61 *A.* 297, 1 *L. R. A., N. S.,* 254 (*Ct. App.* 1905). By the common law, the public pays no costs. "In England, the King does not, and the State stands in place of the King." *United States ex rel. Phillips v. Gaines,* 131 *U. S. Appendix* clxix, 25 *L. Ed.* 733 (1880). The principle is recognized by the United States. The Congress alone may waive or qualify the immunity of the national government from a judgment for costs. *Reeside v. Walker,* 11 *How.* 272, 13 *L. Ed.* 693 (1850); *United States v. Worley,* 281 *U. S.* 339, 50 *S. Ct.* 291, 74 *L. Ed.* 887 (1930); *United States v. Cress,* 243 *U. S.* 316, 37 *S. Ct.* 380, 61 *L. Ed.* 746 (1917); *United States v. Chemical Foundation,* 272 *U. S.* 1, 47 *S. Ct.* 1, 71 *L. Ed.* 131 (1926).

And the recovery of counsel fees and costs from the unsuccessful adversary party, even in a suit involving the rights and interests of private parties, has no basis whatever in the common law. Unless sanctioned by statute or by contract or by a recognized equity, neither counsel fees nor costs are allowable. In the absence of a statute or contract, there can be no recovery of counsel fees, either directly by suit or indirectly as damages for a breach of his bond. *Textileather Corporation v. American Mutual Liability Insurance Co.,* 110 *N. J. L.* 483 (*E. & A.* 1933). But in equity, while the rule is the same as between party and party, there is a recognized discretionary power to award counsel fees, "payable out of a fund, to a complainant or directly to his counsel where he has, at his own expense, either maintained a successful suit for the preservation, protection or increase of a common fund, or brought into court a fund in which others,

similarly situated, may share. This custom or practice originated in the English courts and was based on the theory that the others who benefit should, in good conscience, bear their fair share of the burden of the litigation." *Cintas v. American Car & Foundry Co.*, 133 *N. J. Eq.* 301 (*Ch.* 1943), affirmed 135 *N. J. Eq.* 305 (*E. & A.* 1944). See, also, *Clements v. Clements*, 129 *N. J. Eq.* 350 (*E. & A.* 1941); *Universal Indemnity Insurance Co. v. Caltagirone*, 119 *N. J. Eq.* 491 (*E. & A.* 1936); *Nobile v. Bartletta*, 112 *N. J. Eq.* 304 (*E. & A.* 1933). Under this rule, a mere incidental advantage is not enough; the question is whether the litigation was in the advancement of the interest of those eventually found to be entitled to the fund. 14 *Am. Jur.* 48; 49 *A. L. R.* 1159; 107 *A. L. R.* 753.

Even without sovereign immunity, the "fund in court" doctrine would not entitle the custodian here to a counsel fee. The proceeding was truly adversary; the custodian asserted its own right to the abandoned property, invoked the statute of limitations to defeat the pleaded escheat, and challenged the constitutional sufficiency of the Escheat Act itself and the jurisdiction of the court. I concur in the reasoning and conclusions of Mr. Justice JACOBS in this behalf.

There is no ground under the cited rule, were it applicable against the State, to assess a counsel fee in favor of the custodian for its unsuccessful resistance to the State's demand, nor is a fee allowable for the mere disclosure of the property liable to escheat. Abandoned property is subject to the care and custody of the State, and finally to escheat; and there is no perceivable reason why the custodian should have a counsel fee against the State, or charged to the State's property, which is the same thing, for its eventual recognition of the State's right. The demand of the owner for his property, no matter how long it had lain unclaimed, would have been honored without compensation, and this is the right to which the State has succeeded.

Such is the sense and significance of the statute. Compensation is to be made to the escheator, and there is provision

for the payment of "the fees and expenses of the attorney who shall have prosecuted the escheat." But no mention is made of the custodian. The provision for the payment of "such other fees and costs as the judgment shall direct" follows immediately the direction to pay 5% of the moneys received to the escheator "as a reward for having supplied the information and evidence" resulting in the judgment of escheat, and has reference to the provision of the next succeeding paragraph of the same section authorizing the court to fix the fees and expenses of the attorney who prosecuted the escheat. These provisions are to be taken and compared together, the first as having reference to the specific allowance made by the second. The mention of one implies the exclusion of the other. *Expressio unius est exclusio alterius. Co. Litt.* 210a; *Broom's Maxims* 607, 651. It was necessary to make provision for the prosecuting attorney who was called from the bar by the Attorney-General, and his fees quite naturally were made chargeable to the fund. A design to provide counsel fees to the custodian should not proceed from uncertain inference or doubtful implication. It is not without significance that all proceedings in escheat shall be "without costs to the State or to the parties defendant except that the court may impose such costs or counsel fees against a defendant" who has defended "without reasonable cause or justification." *N. J. S. A.* 2:53–25; *N. J. S.* 2A:37–23.

There being no express provision by statute for the payment of a counsel fee to the custodian of the escheated property, none is allowable. The rule of court and the practice in equity under the rule are utterly without force as against the sovereign.

I would affirm the judgment.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Justices HEHER and JACOBS—2.